Billy COPELAND, Appellant,

v.

Tammy ALSOBROOK, et al., Appellee.

No. 04–98–00155–CV.

Court of Appeals of Texas,
San Antonio.

June 2, 1999.

Rehearing Overruled July 21, 1999.

Jose M. Guerrero, Law Offices of Jose M. Guerrero, San Antonio, for appellant.

Bernard Wm. Fischman, Tinsman & Houser, Inc., San Antonio, for appellee.

Sitting: ALMA L. LÓPEZ, Justice CATHERINE STONE, Justice PAUL W. GREEN, Justice.

## OPINION

Opinion by: ALMA L. LÓPEZ, Justice.

This an appeal from a bench trial awarding the appellee, Tammy Alsobrook, $39,699.35. In addition, Alsobrook was awarded $16,000.00 in attorney's fees. The judgment was awarded from life insurance proceeds paid out to the appellant, Billy Copeland, as a secondary beneficiary under his son's life insurance policy. The proceeds were originally paid into the registry of the court. Because we find the parties entered into a contract by which Copeland agreed to pay his son's debt owed to Alsobrook's parents, we affirm the judgment of the trial court.

### Statement of Facts and Procedural Background

Forrest Copeland married Tammy Alsobrook in 1985. The two had been married for approximately six years when they divorced in 1991. During the marriage, Copeland had borrowed money from various relatives and friends, including his in-laws. The borrowed funds were used for the purpose of establishing and maintaining his business as a diamond wholesaler. While married to Alsobrook, Copeland had also purchased a life insurance policy from Connecticut Mutual Life Insurance Company ("Connecticut Mutual"). Under the policy, Alsobrook was named the primary beneficiary followed by Copeland's father as the secondary beneficiary.

Pursuant to the divorce decree, Copeland maintained his interest in the policy. Under the decree, the debts owed by Forrest Copeland were outlined. Included as a debt, was the amount of $12,000 owed to Jerry Alsobrook, his former father-in-law. Copeland had also borrowed the additional sum of $24,874.66 from the Alsobrooks for his business, Victory Diamonds & Gem Imports. Jerry Alsobrook died in 1996, leaving as survivors his wife, Patricia and their daughter.

After the divorce, Forrest became increasingly ill as a result of a brain tumor. On December 9, 1994, he died of complications resulting from medications he had taken to alleviate his pain. Prior to his death, no steps had been undertaken by Forrest to re-designate his ex-wife as the primary beneficiary.[2] In addition, Forrest had allowed the insurance policy to lapse when he failed to make timely premium payments. After Forrest's death, attempts were made by both Alsobrook and Copeland to gain access to the insurance

---

**2.** By operation of law, Alsobrook's interest as a beneficiary vanished when she divorced Forrest Copeland. The relevant provision of the Texas Family Code governing at the time the policy was purchased stated, in part, the following:

> If a decree of divorce or annulment is rendered after an insured has designated the insured's spouse as a beneficiary under a life insurance policy in force at the time of rendition, a provision in the policy in favor of the insured's former spouse is not effective unless:
> (1) the decree designates the insured's spouse as the beneficiary;
> (2) the insured redesignates the former spouse as the beneficiary after rendition of the decree.

TEX. FAM.CODE. ANN § 3.632(a) (Vernon 1993).

policy proceeds in January 1995. At that time, the parties believed Alsobrook was the rightful primary beneficiary. Alsobrook's purpose for obtaining the proceeds was to pay the debts owed by her former husband, including any debts owed to her parents.

The insurance policy purchased by Forrest contained a disability premium waiver. According to the waiver, recovery under the insurance policy could be had where non-payment of premiums resulted from the policy holder's disability. However, the disability needed to precede the lapse in payment. Alsobrook undertook various steps to prove Forrest's disability to Connecticut Mutual. In May 1995, Billy Copeland sent a letter to Alsobrook regarding the proceeds. In addition, he acknowledged receiving paperwork from Patricia Alsobrook (Tammy's mother). In that letter, he stated to Alsobrook, " Let me assure you Tammy that contingent on receipt of the insurance money, your mom and dad will be paid!!! You wanted this in writing so—this is in writing, your parents will be paid what they are owed if I get the insurance money." By this time, both parties were aware that Alsobrook no longer was the primary beneficiary of the policy. After May 1995, the parties ceased working together to obtain the proceeds.

The Copeland family sued Connecticut Mutual, the insuror, in federal district court. The case, however, never went to trial. Connecticut Mutual eventually settled with the Copeland family. Under the terms of the settlement agreement, Connecticut Mutual agreed to pay the full amount of the policy ($250,000) and attorney's fees ($70,000). However, it conditioned its agreement to pay the insurance proceeds and attorney's fees on receipt of a signed release from Alsobrook in which she disclaimed any right to the policy proceeds, and released Connecticut Mutual

from any liability.[3] Alternatively, Connecticut Mutual would agree to accept a court order disallowing Alsobrook's right to the proceeds. An order was not necessary as Alsobrook signed the release on the condition that the money would be escrowed by Copelands' attorneys pending an agreement as to the amount owed. According to one of Copelands' attorneys, the money was to be held until the parties could agree on an amount. "If they [couldn't] agree to a number, they would come over in [state] court." Connecticut Mutual paid the settlement on July 10, 1996.

The parties failed to agree on an amount that would adequately compensate Patricia Alsobrook for the money which she and her husband had loaned their former son-in-law. In January 1997, the Copelands' attorneys, who had obtained the settlement, inter-pleaded the funds into the registry of the court under cause number 96–CI–16640. That suit was later consolidated with the present case. It was ordered that the Copelands' attorneys be paid, and their claims were subsequently severed. The remaining sum of $201,854.13 was deposited into the registry of the court pursuant to cause number 96–CI–16640. Out of this deposit, it was ordered that Billy Copeland be paid the amount of $82,666.37, leaving a remaining balance of approximately $119,000. From this sum, it was ordered that additional payments be made to Billy Copeland and Neal Willard, a former creditor of the deceased. In the present cause of action, cause number 96–CI–11733, Billy Copeland sought a declaratory judgment from the trial court denying Tammy Alsobrook access to the remaining amounts of money left in the court's registry ($65,675.30). Alsobrook counterclaimed for breach of contract.

In its final judgment, the trial court ordered that Billy Copeland take nothing

---

**3.** The release signed by Alsobrook was a result of a rushed agreement. According to both parties, Connecticut Mutual had just merged in early 1996 with Massachusetts Mutual. Copeland feared the chances of settling would disappear once representatives from Connecticut Mutual were replaced with others from Massachusetts Mutual.

on his declaratory judgment, and that the sums deposited in the registry of the court were recoverable by Tammy Alsobrook, and her mother, Patricia Alsobrook. It ordered that Alsobrook could recover a total amount of $39,699.35 for debts owed, and $16,000.00 for reasonable attorney's fees. All remaining sums were to be paid to Billy Copeland. Pursuant to plaintiff's request for findings of facts and conclusions of law, the trial court concluded that Copeland had entered into a binding agreement with Tammy Alsobrook, the purpose of which was to ensure the repayment of funds owed to Alsobrook's mother by his late son. These findings and conclusions were subsequently amended and supplemented by the trial court and included the following:

4. On January 1995, Tammy Alsobrook and Billy Copeland, operating under a mistaken belief of law that Tammy remained the legal beneficiary, entered into an oral agreement by which they would work together to obtain the proceeds of the Policy, if possible, for the purpose of paying Forrest Copeland's creditors. It was Forrest Copeland's intention that the Policy be used principally to pay his creditors, who had loaned money to him individually and for his business known as Victory Diamonds & Gem Imports, Ltd.

5. In [sic] or about February 1995, Billy Copeland became aware of both the divorce judgment which transferred exclusive ownership of the policy to Forrest Copeland and of TEX. FAM.CODE. § 3.623 which rendered null and void the pre-divorce designation of Tammy as beneficiary.

6. Notwithstanding this knowledge, Billy Copeland verbally agreed to continue efforts to obtain the proceeds of the Policy to pay Forrest's creditors. Of particular importance to Tammy was payment to her mother and father, Jerry and Patricia Alsobrook, residents of Mississippi, monies they had loaned and advanced to Forrest for several pur-

poses. Billy Copeland agreed irrespective of whether other creditors were paid, that Mr. and Mrs. Jerry Alsobrook would be paid in full all sums they had loaned to Forrest prior to his death.

7. Billy Copeland's agreement to pay the Alsobrooks was confirmed in writing by letter dated May 5, 1995. This letter formed a binding contractual obligation, the express condition of which was receipt from Connecticut Mutual of the proceeds of the life insurance policy.

8. In order to obtain the proceeds of the Policy, it was necessary to establish that Forrest Copeland had become disabled prior to the Policy's lapse for nonpayment of premiums. A disability premium waiver rider attached to the Policy would allow such recovery if proof were furnished that Forrest was disabled. Tammy Alsobrook cooperated in furnishing information to Connecticut Mutual to establish Forrest's disability prior to the lapse of the policy. Tammy was in a position effectively to assist in the recovery of the proceeds because she possessed first-hand knowledge of the nature and severity of Forrest's disability; she was familiar with several of his treating physicians and others; familiar with his medical condition; and she stood ready, willing and able to assist in the collection of the Policy proceeds.

8. In furtherance of collecting the Policy proceeds, Tammy wrote to Connecticut Mutual on January 20, 1995 placing the company on notice of Forrest's disability and requesting that the disability rider be invoked. She also contacted Dr. Larry Conrad, one of Forrest's physicians, to obtain his written confirmation of Forrest's disability.

9. After May 1995, and until approximately late April 1996, neither Billy M. Copeland, his surviving son, Chris Copeland, or their attorneys made any request of Tammy Alsobrook to do anything in connection with collecting the Policy proceeds.

10. In April 1996, and continuing until on or about June 27–28 1996, Mr. Bruce Spindler, an attorney with the law firm of Soules and Wallace in San Antonio, Texas, began contacting Tammy Alsobrook to request her completion of a release or disclaimer of the Policy proceeds in order to facilitate settlement of the claim with Connecticut Mutual.

\* \* \*

12. A condition of the settlement between Billy Copeland and Connecticut Mutual was the delivery to Connecticut Mutual of a release or disclaimer from Tammy Alsobrook [to] any interest or claim which she might have to the proceeds of the Policy. Alternatively, the settlement proceeds would not be paid unless and until a final, non-appealable judgment of a court of competent jurisdiction was rendered holding that Tammy Alsobrook had no right, title, interest in the Policy or its proceeds. The settlement proceeds would be due ten days after delivery of such disclaimer or judgment.

13. In March 1996, Connecticut Mutual was merged into Massachusetts Mutual Life Insurance Company. By June 1996, Billy Copeland and his attorneys feared that many of the persons with whom the settlement had been reached would no longer be present in the company and that the agreement might fail for various reasons.

14. A decision was made to attempt to induce Tammy to sign the requested release/disclaimer in order to avoid delay and the risk that the settlement might be lost. At the time, Tammy had not been served with the federal lawsuit as a party defendant, nor was she under any legal compulsion to deliver a release/disclaimer other than to accommodate and facilitate the earlier agreement made with Billy Copeland.

15. On June 28, 1996, in accordance with an agreement captioned as if under Tex. Rule Civ. P. 11, the parties agreed to escrow with Soules & Wallace an amount of funds sufficient to dispose of the entire claim of Patricia Alsobrook. (Jerry Alsobrook having died in March 1996).

16. Tammy Alsobrook would not have entered into the Rule 11 Agreement nor would she have delivered the release/disclaimer to Connecticut Mutual unless she was promised that the amount to which her mother was entitled for the loans and advances to Forrest would be repaid from the funds escrowed with Soules & Wallace. Soules & Wallace were the attorneys for Billy Copeland on June 27–28, 1996 and were authorized to make representations in his behalf and to sign the Rule 11 Agreement. They did not exceed their authority in so doing. Tammy Alsobrook signed and delivered the requested release /disclaimer on June 28, 1996, thereby enabling Billy Copeland (through his attorneys) to obtain the settlement proceeds under the Policy in the gross amount of $320,000. These funds were paid on or about July 10, 1996.

\* \* \*

19 The fund [deposited with the court] was a special deposit by contractual agreement of the parties and thereby lost its character as insurance proceeds.

\* \* \*

Conclusions of Law

3. Billy Copeland contractually obligated himself beginning in January 1995, and continuing through the May 5, 1995 letter to pay to Jerry and Patricia Alsobrook the sums of money loaned and advanced by them to Forrest Copeland, individually if he recovered the proceeds of the insurance Policy. This agreement was supported by consideration and Tammy Alsobrook performed all conditions and requirements of her in order to fulfill the contract. This contract continued through and including delivery of

the release in June 1996, which enabled Billy Copeland to obtain the Policy proceeds, at which point he became obligated to fulfill the remainder of the contract.

4. Patricia Alsobrook was the express intended third party beneficiary of the contract between Tammy Alsobrook and Billy M. Copeland. Although Patricia could have brought suit as intended third party beneficiary, she was not required to do so. Tammy Alsobrook, as a contracting party, was legally empowered to bring her counter-claim for the benefit of Patricia Alsobrook.

\* \* \*

6. The contract was supported by legal and sufficient consideration and is not against public policy.

7. The contract does not contravene art. 21.22 *et seq.* of the Texas Insurance Code in that Copeland's agreement to pay was conditioned on his receipt of the Policy proceeds and Tammy's delivery of the release/disclaimer. All conditions precedent to Copeland's obligation to perform were fulfilled or were waived.

### Standard and Scope of Review

On appeal, Copeland asserts that there was no evidence, or in the alternative, insufficient evidence to sustain the trial court's judgment. When reviewing findings of fact, we employ the same standards that are applied in reviewing the legal and factual sufficiency of the evidence in supporting jury findings. *See Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994); *ASAI v. Vanco Insulation Abatement, Inc.,* 932 S.W.2d 118, 121 (Tex.App.—El Paso 1996, no writ). Where a statement of facts has been filed as part of the record on appeal, findings of fact are not conclusive. *Tucker v. Tucker,* 908 S.W.2d 530, 532 (Tex.App.—San Antonio 1995, writ denied).

Conclusions of law are always reviewable. *State of Bar of Texas v. Leighton,* 956 S.W.2d 667, 671 (Tex.App.—San Antonio 1997, pet. denied). Conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence. *Id.* Such conclusions will not be reversed unless they are erroneous as a matter of law. *Arch Petroleum, Inc. v. Sharp,* 958 S.W.2d 475, 477 (Tex.App.—Austin 1997, no pet.). We review a trial court's conclusions of law de novo. *Hitzelberger v. Samedan Oil Corp.,* 948 S.W.2d 497, 503 (Tex.App.—Waco 1997, writ denied). Incorrect conclusions of law will not be reversed where the controlling findings of fact support any correct legal theory. *Id.; Piazza v. City of Granger,* 909 S.W.2d 529, 532 (Tex.App.—Austin 1995, no writ).

### Formation of Contract

The primary issue which we face in the present case is whether the trial court properly found that a valid contract existed between Billy Copeland and Tammy Alsobrook. Parties enter into a binding contract when the following elements exist: (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Buxani v. Nussbaum,* 940 S.W.2d 350, 352 (Tex.App.—San Antonio 1997, no writ); *McCulley Fine Arts Gallery, Inc. v. "X" Partners,* 860 S.W.2d 473, 477 (Tex.App.—El Paso 1993, no writ). The determination of a meeting of the minds, and thus offer and acceptance, is based on the objective standard of what the parties said and did and not on their subjective state of mind. *See Ishin Speed Sport, Inc. v. Rutherford,* 933 S.W.2d 343, 348 (Tex.App.—Ft. Worth 1996, no writ) (stating that whether conduct exhibits acceptance is a question of fact for the trier of fact.); *Hallmark v. Hand,* 885 S.W.2d 471, 477 (Tex.App.—El Paso 1994, writ denied). Additionally, consideration is a fundamental element of any valid contract. *Smith v. Renz,* 840 S.W.2d 702, 704 (Tex.App.—Corpus Christi 1992, writ denied).

 In his first argument, Copeland alleges that because the party could not agree as to the amount owed to Alsobrook's parents, an essential term of the contract was left out. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex.1992); *America's Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 622 (Tex.App.—San Antonio 1996, writ denied). He concedes, on appeal, that verbal offers and a written offer were made. However, he argues that the lack of an agreed amount precluded an acceptance of Copeland's offer, and negated the existence of a valid contract. *See id.* We disagree.

 In determining the existence of an oral contract, the court looks to the communications between the parties and to the acts and circumstances surrounding those communications. *Wiley v. Bertelsen*, 770 S.W.2d 878, 882 (Tex.App.—Texarkana 1989, no writ). The terms must be expressed with sufficient certainty so that there will be no doubt as to what the parties intended. *Id.* Alsobrook testified that she and Billy Copeland had agreed to work together to obtain the insurance proceeds in January 1995. Copeland testified that his only wish was to see his son Chris paid back for Forrest's funeral expenses. While Copeland denies the existence of an oral contract, subsequent conduct by both parties indicate otherwise.

According to the testimony of both parties, each assumed that Alsobrook was still the primary beneficiary under the policy in January 1995. Alsobrook undertook various steps to enable the payment of the insurance proceeds. Alsobrook testified that she contacted the insurance agent regarding the disability exemption. In addition, she submitted a letter to Connecticut Mutual contending her ex-husband's disability prior to the lapse in premium payments. In that letter, she outlined the extent of Forrest's disability based on her own knowledge and on information provided by Forrest's treating physician. She called the Copelands regarding this letter seeking their approval. Alsobrook testified that the family approved the letter. Copeland did not controvert this statement. Moreover, a letter dated February 28, 1995, was sent from Copeland to Alsobrook. In that letter, he reminded her that no time limit existed for filing a claim with the insurance company. He emphasized the importance of the insurance company having all the facts so that it could not dispute anything. In the same letter, Copeland acknowledged his wish that Alsobrook's parents be paid the money they were owed, in addition to other individuals. Finally, the Copelands sent a letter to Alsobrook on May 5, 1995, referencing the oral contract.[4]

 It is not enough that one party thinks there was a contract; they must show that their intentions to contract were expressed in a manner that the court is capable of understanding. *See Williford Energy Co. v. Submergible Cable Servs.*, 895 S.W.2d 379, 384 (Tex.App.—Amarillo 1994, no writ). Where the fact finder determines that one party reasonably drew the inference of a promise from the other party's conduct, that promise will be given effect in law. *Id.* Having reviewed the evidence, we conclude there was sufficient

---

4. On appeal, Copeland refers to the May 5th letter as an offer which was subsequently rejected by Alsobrook. Copeland asserts that the offer was rejected by Alsobrook when she failed to comply with his request, as contained in his letter, for her paperwork. We disagree. Conduct of the parties prior to May 5th, established that a contract existed. The wording of the letter clearly referenced that contract. At best, Copeland's request that Alsobrook return paperwork amounted to an attempted novation of the prior contract; that is, a changing of the terms of the old contract to form a new contract. *See Flanagan v. Martin*, 880 S.W.2d 863, 867 (Tex.App.—Waco 1994, writ dism'd w.o.j.) (stating that the mutual agreement of all parties to the terms of the new contract, an element of novation, can be inferred from the acts of the parties); *Talamas v. Bressi International*, 727 S.W.2d 72, 74 (Tex.App.—San Antonio 1987, writ ref'd n.r.e.). Alsobrook's failure to return her paperwork constituted an effective refusal to the terms of a new contract.

evidence to support the trial court's findings that the parties entered into an oral contract in January 1995, that the parties conduct evidenced that contract, and that the contract was later confirmed in writing.

The trial court could have also found a meeting of the minds, and thus offer and acceptance, based on the conduct of the parties in June 1996. At that time, the Copelands were on the verge of reaching a settlement agreement with Connecticut Mutual. Alsobrook testified that the Copelands, via their attorney Bruce Spindler, led her to believe that they were still willing to pay the total amount owed to her parents. According to Alsobrook, Spindler made the assurance that so long as Alsobrook could prove what was owed to her parents, the Copelands would pay her. However, they needed for her to sign the release for Connecticut Mutual. Her own attorney, Walter Thurmond, testified that his client would not have signed a release had she not been told that the Copelands were willing to pay her something from the insurance proceeds; something which could be documented. Spindler also testified, and admitted that Connecticut Mutual would not settle without a release from Alsobrook or a court order. Finally, Copeland himself testified that his intentions were to pay Pat and Jerry Alsobrook. He conceded, however, that "there wasn't an amount proven at that point."[5] Based on the circumstances noted above, we hold that there was sufficient evidence to support the trial court's findings of fact regarding the events between January 1995 and June 1996.

The next issue we address is whether the contract was supported by valid consideration. Copeland contends that even if a valid contract existed, there was no consideration to support the contract because Alsobrook was under a duty to execute all necessary documents to effectuate the passing of interest under her divorce decree. Being under a duty to perform, Copeland argues, consideration did not exist. *See Trevino & Gonzalez v. R.F. Muller Co.*, 949 S.W.2d 39, 42 (Tex. App.—San Antonio 1997, no writ). Alsobrook contends that her continued cooperation in obtaining the proceeds was consideration. Furthermore, that the signing of the release was of "value" to Copeland, who was then able to obtain the insurance proceeds. As such, consideration existed to support the contract in June 1996.

Consideration is a present exchange bargained for in return for a promise. *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex.1991). It can be either a benefit to the promisor or a detriment to the promisee. *Id.* It may consist of some right, interest, or profit, or benefit that accrues to one party, or, alternatively, of some forbearance, loss or responsibility that is undertaken or incurred by the other party. *Solomon v. Greenblatt*, 812 S.W.2d 7, 15 (Tex.App.—Dallas 1991, no writ). A promise for a promise is sufficient consideration in Texas. *Crest Const., Inc. v. Murray*, 888 S.W.2d 931, 942 (Tex. App.—Beaumont 1994), *reversed on other grounds*, 900 S.W.2d 342 (Tex.1995). A contract that lacks consideration lacks mutuality of obligation and is unenforceable.

5. According to Alsobrook's testimony, Spindler had contacted her in April 1996. He communicated to her that Connecticut Mutual was willing to settle so long as they were able to obtain a release signed by Alsobrook in which she released Connecticut Mutual from any liability regarding the release of the proceeds. She stated that she signed the release at the behest of Spindler who was worried that the settlement would fall through given the fact that Connecticut Mutual would soon be merging with Massachusetts Mutual.

Both Spindler and Thurmond negotiated the deal, by which Alsobrook would agree to sign a release in favor of Connecticut Mutual so long as the release was not interpreted as a waiver or release to any right, title or interest which Alsobrook may have had. Spindler agreed, and assured Thurmond that the money would be kept in a special deposit pending agreement by Copeland and Alsobrook on the amount owed. Their communications were evidenced by faxed transmittals between Thurmond and Spindler on June 28, 1996.

*Federal Sign v. Texas Southern University,* 951 S.W.2d 401, 409 (Tex.1997).

In the present case, Alsobrook and Copeland initially exchanged the promise to work together to obtain the proceeds of the insurance policy. Pursuant to that promise, Alsobrook undertook various actions to help obtain those proceeds such as contacting the insurance agent, doctors, and Connecticut Mutual. We further find consideration based on the perception that Alsobrook could pose a problem to the obtaining of a settlement, and as such, bestowed value on her position. By obtaining her signature on a release, Copeland was able to effectuate the release of the proceeds from Connecticut Mutual. Without a release from Alsobrook, Copeland would have had to initiate a proceeding seeking a court order that Alsobrook had no beneficiary's right to the proceeds. By obtaining her release, Copeland was spared the additional time and expense, and the possibility of the chance that negotiations would fall through with the new insuror, Massachusetts Mutual. We agree with Alsobrook that this constituted sufficient consideration, thus mutuality of obligation, to support the contract.

We do not agree with Copeland's argument that Alsobrook was under a duty to sign the release pursuant to the requirements of the divorce decree entered into by Alsobrook and her former husband.[6] *See Martens v. Prairie Producing Co.,* 668 S.W.2d 889, 891 (Tex.App.—Hous. (14th

Dist.) 1984, no writ) (stating that the discharge of legal duty is not valid consideration). By operation of law, any interest which Alsobrook maintained as a primary beneficiary terminated with the divorce decree, thus such proceeds automatically became payable to Copeland as the secondary beneficiary. TEX. FAM CODE ANN. § 3.632 (Vernon 1993); *see Sever v. Massachusetts Mutual Life Ins. Co.,* 944 S.W.2d 486, 490 (Tex.App.—Amarillo 1997, writ denied). Simply, no paperwork was needed to effectuate the passing of proceeds to Copeland as a secondary beneficiary.

We hold that a valid and enforceable contract existed between the parties as a matter of law. Therefore, we affirm the trial court's conclusions of law holding the same. In addition, we hold that sufficient evidence existed in the record to support the sum awarded pursuant to that contract.[7] Accordingly, appellant's first twenty-one issues are overruled.

■ In issues twenty-eight through thirty-three, Copeland takes specific issue with the trial court's finding of the proceeds as a special deposit and ordering the payment of damages from this deposit. The trial court concluded, as a matter of law, that the contract did not contravene article 21.22 on the basis that Copeland's agreement to pay was conditioned on his receipt of the policy proceeds and Alsobrook's delivery of the release disclaimer. Copeland argues that even if a contract

---

6. In short, Copeland asserts that the provisions of the couple's divorce decree iterated that the decree was to be treated as a contract. Under that contract, both parties agreed to "execute and deliver to the other deeds, bills of sale, assignments, consents to change of beneficiaries, tax returns and any and all reasonable and necessary, assignments and conveyances which instruments are deemed appropriate in the opinion of the counsel for either party ... to effectuate the provisions and purposes of [the] Decree ..." The decree also provided that the decree would inure to the benefit of the parties' respective " legatees, devises, heirs, executors, administrator, assigns, and successors in interest of the parties."

7. Appellant also contends that the trial court's finding of a specific sum was not supported by the evidence. We disagree. At trial, the evidence regarding the amount owed to Patricia and Jerry Alsobrook included in the divorce decree, and Victory Diamond & Gem paperwork. The decree outlined $12,000 as being owed to Jerry Alsobrook. Paperwork, recovered by the Patricia Alsobrook, included a letter on business letterhead signed by Forrest in which he documented the amount owed by him to Jerry and Patricia Alsobrook. The balance noted as owed was $24,874.66. Copeland did not present evidence contradicting these amounts.

existed between him and Alsobrook, that contract violates article 21.22. We disagree.

The version of article 21.22 in effect at the time the policy was issued provided that all money or benefits (e.g. policy proceeds) were exempt from being seized, taken or appropriated to pay any debt or liability of the insured or beneficiary. Act of March 24, 1987, 70th Leg., R.S., ch. 5, 1987 Tex. Gen. Laws 22 (amended 1997) (current version at Tex. Ins.Code Ann. art. 21.22 § 1 (Vernon Supp.1999)). What is noteworthy about this article, is that it applied to insurance benefits which were the subject of seizure. This is not the situation in the present case. Here, Alsobrook's beneficiary rights to the insurance proceeds vanished by operation of law. As such, when such proceeds were paid out, as they subsequently were, they inured to the benefit of Copeland as the secondary beneficiary. There simply was not a seizure or appropriation of the proceeds to trigger the application of article 21.22. Rather, Copeland chose to effectively contract away a portion of those proceeds in exchange for Alsobrook's assistance in obtaining the proceeds. For this reason, we do not find that article 21.11 is applicable.

While Alsobrook would have us treat this as a debt secured by a pledge of the proceeds, we hesitate to do so. *See* Act of June 15,1991, 72nd Leg., R.S., ch. 609 § 3, 1991 Tex. Gen. Laws 2217, 2218 (amended 1997) (current version at Tex. Ins.Code. Ann. art. 21.22 § 3(2) (Vernon 1999)). There is no evidence that either Forrest Copeland, or his father, as beneficiary, incurred the debts by securing a pledge on the policies of the proceeds. That is a different scenario from the facts which are presented here for our review. Because we hold that the contract does not violate article 21.22, we affirm the trial court's conclusion of law holding the same. We overrule appellant's issues.

■■■ Next, we address Copeland's argument that Alsobrook lacked standing to sue. The trial court below concluded, as a matter of law, that Patricia Alsobrook was the intended third party beneficiary to the contract between Alsobrook and Copeland. As such, while Patricia Alsobrook could have brought suit against Copeland, she did not have to. The trial court held that Alsobrook, as the contracting party, was empowered to bring a counter-claim for breach of contract. We agree.

■■■ In general, only the parties to a contract have the right to complain of a breach thereof. Such is the case in the present cause of action. In the case of an intended third party beneficiary of a contract, the promisee has the right to maintain an action against the promisor on a contract made for the benefit of the third party. *Stegall v. Stegall*, 571 S.W.2d 564, 566 (Tex.Civ.App.—Fort Worth 1978, no writ). Here, Copeland and Alsobrook entered into a contract whereby the intended beneficiary was Patricia Alsobrook, Alsobrook's sole surviving parent. Clearly, Alsobrook maintained a justiciable interest and the right to sue. For this reason, we affirm the trial court's conclusion of law. Accordingly, we overrule issues twenty-two through twenty-seven.

■■■ In his final two issues, Copeland asserts that the trial court erred in awarding Alsobrook attorney's fees on appeal as there was no evidence to support such fees. Texas law permits the recovery of attorney's fees in a claim brought on an oral or written contract. Tex. Civ. Prac. & Rem.Code § 38.001(8) (Vernon 1997). To recover, a claimant must be represented by an attorney, present the claim to the opposing party, and payment must not be tendered before the expiration of thirty days from presentment. Tex. Civ. Prac. & Rem.Code § 38.002 (Vernon 1997). With respect to attorney's fees, the court is permitted to take judicial notice of the usual and customary attorney's fees in a proceeding. Tex. Civ. Prac. & Rem.Code § 38.004 (Vernon 1997).

According to the pleadings, Alsobrook properly pled and prayed for attorney's

fees, both at trial and on appeal. Therefore, notice was given to Copeland that attorney's fees were being sought. The record does not reflect that a special exception was filed by Copeland. While there is evidence in the record to support attorney's fees for trial, there was none for appeal. In absence of this evidence, we presume that the reviewing court took judicial notice of the usual and customary fees on appeal. *See Ross v. 3D Tower Ltd.,* 824 S.W.2d 270, 273 (Tex.App.—Houston [14th Dist.] 1992, writ denied). Furthermore, we will not overturn an award of attorney's fees absent an abuse of discretion. We find that sufficient evidence existed in the record to support the trial court's award of attorney's fees on appeal, and that the trial court did not abuse its discretion. Copeland's remaining issues are overruled.

For the reasons stated in this opinion, the judgment of the trial court is affirmed.