

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00200-CV

---

THOMAS G. MCCOY                                                    APPELLANT

V.

ALDEN INDUSTRIES, INC.                                            APPELLEE

----------

FROM THE 48TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 48-252036-11

----------

## DISSENTING OPINION

----------

### Introduction

I would affirm the summary judgment for Alden, and accordingly, I respectfully dissent.

To prevail on his breach of contract claim, McCoy has to prove the existence of a valid insurance-funded stock redemption contract that contains the

terms he wants enforced.[1]  To establish the existence of the contract, McCoy must prove, among other elements, a meeting of the minds on the terms of the agreement.[2]  One of Alden's no-evidence grounds on which judgment was granted was that there was no evidence of "a meeting of the minds on all essential and materials terms of the alleged 'Comprehensive Agreement'" of which the stock redemption agreement was allegedly part.  The trial court agreed with Alden on this ground.

The determination of whether there is a meeting of the minds "is based on the *objective* standard of what the parties said and did and not on their subjective state of mind."[3]  "The parties must indicate, either expressly or through their conduct, that they mutually intend to contract."[4]

Agreements to make future agreements may be binding if they contain all the material terms.[5]  But without a meeting of the minds on the material terms,

---

[1]*See Muenster Hosp. Dist. v. Carter*, 216 S.W.3d 500, 505 (Tex. App.—Fort Worth 2007, no pet.) (setting out the elements for a breach of contract claim).

[2]*Williams v. Unifund CCR Partners Assignee of Citibank*, 264 S.W.3d 231, 236 (Tex. App.—Houston [1st Dist.] 2008, no pet.).

[3]*Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex. App.—San Antonio 1999, pet. denied) (emphasis added).

[4]*Outdoors v. Noah*, No. 2-09-247-CV, 2010 WL 1946872, at *3 (Tex. App.—Fort Worth May 13, 2010, no pet.) (mem. op.) (citing *Williford Energy Co. v. Submergible Cable Servs., Inc.*, 895 S.W.2d 379, 384 (Tex. App.—Amarillo 1994, no writ)).

[5]*McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013).

agreements to agree are not enforceable because "courts have no way to determine what terms would have been agreed to after negotiation."[6]

Alden does not dispute that the parties intended to have an insurance-funded redemption agreement, and the interim agreements show that it at one point had an agreement with him on that subject. The summary judgment evidence, however, shows that the parties did not have an agreement with the specific terms that McCoy is suing to enforce.

As the majority notes, the summary term sheet states that Alden will have insurance on McCoy. The summary sheet does not, however, address the following:

- whether Alden was required to *keep* life insurance for McCoy for the purpose of buying his remaining shares after his death and to use the proceeds to buy the shares, or whether the stock redemption agreement was for Alden's benefit and only gave it an option to buy the shares;

- what the term "family interest" includes;

- what Alden's rights were after McCoy's death to buy any shares he had transferred to a non-family-interest third party;

- if McCoy transferred shares to a family interest during his life, whether Alden would be *required* to purchase those transferred

---

[6] *Id.*

3

shares after McCoy's death or would have only an option to buy them (such as the right of first refusal in the redemption agreement Alden already had with Adams);

- whether any third parties to whom McCoy transferred shares would have an obligation to sell the shares to Alden at McCoy's death;

- if McCoy transferred some shares to a nonfamily interest third party, whether Alden had to pay McCoy's estate $30 million for the shares McCoy still held at his death, no matter how few shares that may be; or

- whether $30 million was the value that the parties agreed the shares were expected to be worth at McCoy's death, an amount demanded by McCoy that was unrelated to the price of the shares, or an amount selected by Alden in excess of the price of the shares and thus an amount that could be decreased at Alden's discretion.

McCoy argues that the summary sheet does not leave terms open because if he were to transfer some of his stock to non-family third parties, restrictions in the corporate governance agreement executed as part of the June 2008 stock sale would be triggered, and Alden could prevent transfers of McCoy's stock to any non-family transferees. But the corporate governance agreement does not help him because that document gives Alden a right of first refusal but does not *prevent* McCoy from transferring his stock to a third party who is not a family member. The corporate governance agreement does not

4

give Alden the right to buy back after McCoy's death any shares transferred to a non-family third party.

Alden asserted in the trial court that the summary sheet does not address how much it would have to pay for the shares still held by McCoy at his death if he transferred some shares to a third party. McCoy argues that "either the transfers are subject to the right to repurchase . . . or the transfers result in a proportionate reduction in the purchase price to redeem McCoy's stock upon his death." He rejects Alden's argument that if he transfers shares to a non-family third party, it might be required to pay his estate the full $30 million for whatever stock he still holds at his death, arguing that "a reviewing court would be required to reject the absurd and unreasonable interpretation of the agreement articulated by Alden."

McCoy's arguments, however, illustrate Alden's assertion in its summary judgment motion—McCoy has to rely on a reviewing court to decide what would be the obligations and rights of Alden upon his death with respect to the redemption of his remaining shares because the summary sheet leaves open for disagreement what the parties intended and assumes that the parties do not know from the summary sheet what their respective obligations and rights are. This is in contrast to the redemption agreement that Adams signed in 1998, which set out a specific price per share that Alden would pay for Adams's shares after his death.

5

The summary sheet is some evidence of what is undisputed by the parties—that the parties discussed an agreement about Alden's purchase of McCoy's remaining shares, that the parties agreed that such a purchase should be funded by an insurance policy on McCoy's life, and that the parties discussed this plan in connection with the negotiation of the 2008 loan agreement. It is also evidence that the parties, at that point in time, agreed that the policy amount should be $30 million. But it is not evidence that the parties had agreed to the specific terms of the contract that McCoy now seeks to enforce.[7]

McCoy further contends that the agreement of the parties is accurately memorialized in the 2008 fourth draft redemption agreement that McCrury circulated to McCoy, Adams (who was not yet a director at that time), and board member Youts (but not to other directors), and which McCoy (but not Alden) signed. McCrury stated in his email sending the document that if the recipients did not have any comments or questions, "the drafts" would be "circulate[d] for signature." This email does not, however, say whose signatures were needed and does not indicate whether the board had approved, discussed, or even been fully informed of the draft's terms. McCrury's email indicates, though, that the document was a reflection of what *McCrury* understood the parties to the email had agreed on as of the time of the email.

---

[7] *See Copeland*, 3 S.W.3d at 604 (applying an objective standard in determining whether the parties had a meeting of the minds).

This draft redemption agreement states that upon the death of McCoy, Alden "shall be obligated" to buy equity interests held by McCoy or his wife for the purchase price of $30 million. That language, in isolation from the rest of the document, supports McCoy's position. And the agreement further states that it is "the intent of Alden" to fund the purchase with life insurance on McCoy.

In the next paragraph, however, the agreement states that "[i]n the event [that] this Agreement is not funded with insurance on the life of [McCoy]" or that any insurance cannot be collected, "then the obligations of Alden to purchase all of [McCoy's] Equity Interests, including any Equity Interests held in the name of the spouse of [McCoy], shall be waived, notwithstanding any other provision of this Agreement to the contrary." Nothing in the agreement's language *requires* Alden to buy life insurance on McCoy to fund the agreement, or, if it acquired such insurance, to *keep it* for the rest of McCoy's life. Accordingly, contrary to McCoy's claim of what the parties had agreed to, this agreement does not evidence an agreement by the parties that Alden would be required to either buy or keep insurance on McCoy's life.

Further, McCoy argues that Alden was *obligated* under the agreement to redeem shares held by his family trust after his death, but, like the summary sheet, the draft redemption does not say that. McCoy is authorized under the terms of this draft agreement to transfer some of his stock to his trust provided that the trust agrees to abide by the terms of the agreement, and he did in fact make a transfer to the trust. The draft redemption agreement also states,

7

however, that Alden's written approval was required before McCoy could assign his rights or interest under the agreement. And it only specified an obligation by Alden to buy stock held in the name of McCoy or his wife. Given that McCoy does not point out any evidence that Alden agreed in writing to the assignment of any part of McCoy's interest or rights in the agreement (other than the interim agreements executed after the transfers, which he argues are unenforceable), the draft redemption agreement does not indicate that, under this agreement, the trust could compel Alden to purchase the shares that McCoy had transferred to the trust.

McCoy argues that by reading this draft together with the summary sheet, Alden had agreed to buy back shares transferred to the trust. There are two holes in this argument. First, the summary sheet does not specify whether "family interest" means McCoy's shares held in his wife's name or whether it also includes any shares transferred to a family trust (and the summary sheet indicates that Alden would be able to buy the shares but does not spell out any obligation for it to do so). Second, McCoy asserts that the 2008 draft redemption agreement is an accurate, enforceable reflection of the parties' agreement, and that document (1) states that it supersedes any prior agreement or understanding on the subject and (2) does not require Alden to buy back shares transferred to a trust unless Alden agreed in writing to the transfer of shares to the trust. The draft redemption agreement does not raise a fact issue about a meeting of the

8

minds on the terms that McCoy is trying to enforce in this suit, which are not reflected in that document.[8]

McCoy further argues that the agreement is not indefinite as to duration, and the majority agrees with him. McCoy also argues that the agreement is not indefinite as to costs because one of the loan agreements funding the 2008 stock sale transaction "placed conditions on the ability to pay for and use insurance to fund a redemption of McCoy's remaining shares, including a cap on the amount of money Alden could be forced to pay each year for the insurance policies." However, McCoy's breach of contract claim is premised on the argument that Alden was required to acquire *and keep* a $30 million insurance policy and to use the payout from the policy to buy back his shares. Thus, regardless of any caps on insurance premiums provided by the loan agreement, McCoy wants Alden to maintain a $30 million policy, he contends that its failure to do so is a breach of their agreement, and he asked the trial court to compel Alden to maintain such a policy. He cannot have it both ways.

In summary, the language of the draft agreement, which McCoy argued was a memorialization of the parties' agreement, does not suggest that it was part of any comprehensive agreement. It does not obligate Alden to buy or keep insurance on McCoy's life to fund a stock repurchase after his death, whatever the parties may have discussed at some earlier point of negotiations. It does not

---

[8] *See id.*

9

give McCoy's family trust the right to compel Alden to purchase the shares transferred to it by McCoy without Alden's prior written consent. Thus, even if we were to hold that this draft agreement contains all the essential terms for *an* enforceable stock redemption agreement, it does not contain or raise a fact issue about the terms that *McCoy seeks to enforce.* Accordingly, I would hold that McCoy's evidence does not show a meeting of the minds and therefore does not raise a fact question about the existence of a valid contract. Because McCoy failed to raise a fact issue on whether the parties had a valid contract that included the terms he sues on, I would hold that the trial court was correct to grant no-evidence summary judgment on this part of McCoy's suit and overrule this part of McCoy's first issue.

I would further hold that McCoy failed to raise a fact issue about whether Alden is estopped from denying McCoy the long-term insurance-funded redemption agreement. His argument is that Alden cannot retain benefits from the 2008 stock-loan transaction and also be allowed to "back out on material terms of the agreement that were promised to McCoy to get him to agree to the deal."

McCoy does not specify in his brief what kind of estoppel he is asserting, but his argument and the cases he cites relate to quasi-estoppel. Because quasi-estoppel is an affirmative defense, in order to defeat Alden's right to summary judgment, McCoy had to come forward with evidence sufficient to raise

a fact issue on each element of the defense.[9]  McCoy failed, however, to produce evidence raising a fact issue about whether Alden struck a bargain with McCoy, and then, after McCoy performed his side of the bargain, tried to avoid performing its obligations under the deal by claiming there was no bargain.

McCoy directs us to certain occurrences and argues that these events indicate that Alden received benefits from the comprehensive agreement that it claims does not exist.  The events he relies on, however, were all called for or resulted from the implementation of the 2008 stock-loan transaction—Alden's redemption of a portion of his shares, Adams's assuming the role of CEO, Alden's shareholders approving a voting trust under which Adams gained control of voting rights of the majority of Alden's shares, and McCoy's selling of his shares to Alden rather than to outside third parties.

This is evidence of performance of the 2008 stock-loan transaction. Nothing about these events indicates that the transaction was only the first part of a bigger agreement that Alden failed to perform.  McCoy does not dispute that he has kept his seat as director as called for under the agreements implementing the 2008 stock-loan transaction or that Alden has performed its obligations as set out in the loan agreements, the 2008 stock redemption, or any of the written agreements accompanying that transaction.

---

[9]*See Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984).

11

I would further hold that the trial court was correct in granting summary judgment on McCoy's director compensation claim. Alden sought summary judgment on the ground that there was no meeting of the minds on the material terms of a compensation agreement under which McCoy would be paid $250,000 a year for as long as he served as a director. It argued that Alden's bylaws required its board of directors or executive committee to approve compensation for officers, which includes the board chairman; that McCoy admitted that the board did not approve the compensation he seeks to enforce on appeal; and that Alden did not communicate any such agreement to McCoy.

Alden's summary judgment evidence included a copy of the bylaws, which provide that the chairman of the board is an officer of the company. The section of the bylaws addressing salaries of officers states that "[t]he salaries of *all* officers shall be fixed by the board of directors or the Executive Committee." [Emphasis added.] Thus, under Alden's bylaws, the board of directors had to determine McCoy's compensation for his service as chairman of Alden's board of directors. McCoy and Adams did not have authority to set his compensation at $250,000 a year for the duration of his service as chairman.

Excerpts of Youts's and MacKenzie's depositions, attached by McCoy to his summary judgment response, indicate that Youts, a board member, had discussed McCoy's compensation with MacKenzie before June 2008, which was before MacKenzie joined the board. McCoy also cites to evidence that Adams signed the payroll change notice at a time when Adams was not a member of the

12

board. None of McCoy's evidence addresses, much less raises a fact issue, about whether the *board* approved the compensation as required by Alden's bylaws. None of his evidence shows a discussion of his compensation at a board meeting, a vote by the board, or some other action by the board fixing his compensation at that level. If Alden has an executive committee for setting compensation, McCoy has not pointed out evidence of who the members of that committee were or that the committee executed a compensation agreement with him or fixed his compensation at that level.

McCoy argues that a paragraph in the loan agreement funding the 2008 stock sale prevents amendment of agreements with directors without written consent. Even assuming that the relevant paragraph of the loan agreement applies to an agreement about McCoy's director compensation, however, it does not apply here. There is no evidence that Alden *amended* an agreement to pay him $250,000 for the duration of his serving as director because there is no evidence he had any such board-approved agreement with Alden to amend. Accordingly, I would hold that the trial court correctly granted summary judgment for Alden on McCoy's director compensation claim.

Because I would hold that McCoy did not produce evidence to raise a fact issue about whether he and Alden had a meeting of the minds on a stock redemption agreement on the terms he seeks to enforce or about whether Alden had agreed to the director compensation package he sues for, I would affirm the

13

trial court's summary judgment. Because the majority does not, I respectfully dissent.

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

DELIVERED: July 9, 2015