

## Fourth Court of Appeals
### San Antonio, Texas

### OPINION

No. 04-16-00501-CV

**BORAIN CAPITAL, LLC**,
Appellant

v.

Syed **HASHMI**,
Appellee

From the 225th Judicial District Court, Bexar County, Texas
Trial Court No. 2014-CI-11798
The Honorable Barbara Hanson Nellermoe, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:    Karen Angelini, Justice
    Marialyn Barnard, Justice
    Luz Elena D. Chapa, Justice

Delivered and Filed:  July 19, 2017

REVERSED AND RENDERED

Syed Hashmi sued BoRain Capital, LLC for breach of contract. Although a jury found that Hashmi failed to prove the existence of an agreement between Hashmi and BoRain, the trial court granted judgment against BoRain notwithstanding the jury's verdict. BoRain appealed. We conclude the trial court erred in granting judgment notwithstanding the verdict, and therefore, reverse the trial court's judgment and render judgment that Hashmi take nothing.

## FACTUAL AND PROCEDURAL BACKGROUND

Hashmi owned a note in the amount of $122,400.00 that he wanted to sell.[1] Hashmi contacted Susan Rogers, vice president of Chaminade Capital Corporation, who brokered a deal between Hashmi and Northeastern Capital. Under the deal, Northeastern would buy the note from Hashmi for $83,477.00. Hashmi and Northeastern entered into a purchase agreement. Shortly thereafter, Northeastern entered into a deal with BoRain for BoRain to buy the note for $93,283.71.

West and West, a firm in San Antonio, Texas, handled the closing. BoRain and Northeastern each paid as agreed. However, no documents were prepared to show the transfer of the note from Hashmi to Northeastern. The closing documents showed only the transfer of the note from Hashmi to BoRain.

Hashmi provided West with his bank routing number and account information via email so that the funds owed him from the sale could be directly deposited into his account at a local bank. However, Hashmi's email account was hacked and the hacker, posing as Hashmi, sent an email to West instructing it to wire the funds to a bank account in Malaysia. Unaware that Hashmi's email account had been hacked, West followed the instructions in the email and wired the funds from the sale of the note to the bank account in Malaysia, instead of to Hashmi's local bank account. By the time the parties realized that Hashmi's email account had been hacked and the funds diverted, the banks were unable to reverse the transaction. The hacker made off with the sale proceeds due to Hashmi.

Hashmi sued West for breach of fiduciary duty and BoRain for breach of contract. The case was tried to a jury. In Question No. 4 of the jury charge, the jury was asked, "Did BoRain Capital, LLC agree to buy Mr. Hashmi's note?" The jury answered, "No." Because of this finding,

---

[1]Hashmi had acquired the real estate lien note from the sale of real property.

the jury did not answer Question No. 5, which stated, "Did BoRain Capital, LLC fail to comply with its agreement to pay Mr. Hashmi for the note in question?" Additionally, the jury found West failed to comply with its duties as escrow/closing agent by wiring funds to the wrong account and attributed one hundred percent of the responsibility for the harm to West. The jury also made findings regarding the amount of reasonable attorney's fees.

During trial, Hashmi and West reached a high-low settlement agreement. West ultimately paid Hashmi $81,500.00 in accordance with the parties' agreement.

After trial, Hashmi moved for judgment notwithstanding the verdict, asserting there was no evidence that Northeastern was the seller of the note as argued by BoRain. Hashmi argued that the evidence conclusively established an implied-in-fact contract between Hashmi and BoRain. Hashmi further argued that the evidence conclusively established that West was BoRain's agent for the delivery of funds to Hashmi and that, once West diverted the funds to the hacker, BoRain remained liable to him for the purchase price of the note. Based on these arguments, Hashmi asserted that the evidence conclusively established that the answers to Questions 4 and 5 were "Yes."

The trial court agreed with Hashmi, granted his motion for judgment notwithstanding the verdict, and rendered judgment that Hashmi recover from BoRain the sum of $81,362.66 plus prejudgment interest, $41,101.00 in attorney's fees for trial, and additional attorney's fees for appeal. The trial court then reduced the amount of the judgment by $81,500.00, the amount Hashmi recovered under the settlement agreement with West. BoRain appeals from this judgment.[2]

---

[2]West is not involved in this appeal.

## ISSUES PRESENTED ON APPEAL

BoRain presents three issues on appeal. In its first two issues, BoRain argues the trial court erred in granting judgment notwithstanding the verdict on Hashmi's breach of contract claim. In its third issue, BoRain argues that, even if the trial court did not err in granting judgment notwithstanding the verdict, it erred in awarding attorney's fees to Hashmi. Because our resolution of the first issue is dispositive, we do not reach BoRain's second and third issues.

## EXISTENCE OF AN AGREEMENT BETWEEN HASHMI AND BORAIN

In its first issue, BoRain argues the trial court erred in disregarding the jury's adverse finding concerning the existence of an agreement between Hashmi and BoRain.

### *Standard of Review*

Generally, a trial court may disregard a jury's findings and grant a judgment notwithstanding the verdict when there is no evidence upon which a jury could have based its findings. *Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex. 1990). Stated another way, a trial court may grant a motion for judgment notwithstanding the verdict if a directed verdict would have been proper. TEX. R. CIV. P. 301; *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991).

When a party with the burden of proof complains from an adverse jury finding on the basis that the matter was established as a matter of law, appellate courts apply a two-step analysis. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989). First, we examine the record for evidence supporting the finding and ignore all evidence to the contrary. *Id.*; *Walker v. Ricks*, 101 S.W.3d 740, 745 (Tex. App.—Corpus Christi 2003, no pet.). In conducting this review, we must consider the evidence and inferences not as they support the judgment, but as they tend to support the verdict. *Mancorp*, 802 S.W2d at 228. If there is more than a scintilla of evidence to support the jury's finding, then we must reverse the judgment notwithstanding the verdict. *Walker*, 101 S.W.3d

at 745; *see Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009). More than a scintilla of evidence exists when the evidence supporting the finding rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338, 347 (Tex. 2015). Second, if we find no evidence supports the jury's finding, we determine from the record whether the contrary proposition is established as a matter of law. *Sterner*, 767 S.W.2d at 690; *Walker*, 101 S.W.3d at 745.

*Applicable Law*

To recover on a breach of contract claim, the plaintiff must prove (1) the existence of a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff was damaged as a result of the breach. *McLaughlin, Inc. v. Northstar Drillling Tech., Inc.*, 138 S.W.3d 24, 27 (Tex. App.—San Antonio 2004, no pet.).

To create an enforceable contract, there must be (1) an offer, (2) acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *2001 Trinity Fund, LLC v. Carrizo Oil & Gas, Inc.*, 393 S.W.3d 442, 449 (Tex. App.—Houston [14th Dist.] 2012, pet. denied); *Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex. App.—San Antonio 1999, pet. denied). To prove that an offer was made, a party must show (1) the offeror intended to make an offer; (2) the terms of the offer were clear and definite; and (3) the offeror communicated the essential terms of the offer to the offeree. *Domingo v. Mitchell*, 257 S.W.3d 34, 39 (Tex. App.—Texarkana 2008, pet. denied). An acceptance must be identical to the offer. *Id*. A "meeting of the minds" is a mutual understanding and assent to the expression of the parties' agreement. *Id*. at 40. Mutual assent concerning material, essential terms is a prerequisite to the formation of a binding contract. *2001 Trinity*, 393 S.W.3d at 449.

A contract can be express or implied-in-fact. The difference between express contracts and implied contracts is the means by which the contracts are formed. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 850 (Tex. 2009). An express contract arises when the contractual terms are stated by the parties. *Haws & Garrett General Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972). A contract implied-in-fact arises from the acts and conduct of the parties. *Id*. In the case of an implied contract, mutual assent is inferred from the circumstances; a "meeting of the minds" is inferred from and evidenced by the parties' conduct and course of dealing. *Id*. "An inference is but a deduction which the trier of fact makes from the facts proved, the drawing of which is essentially the exercise of a fact finding function." *Id*. at 610.

### The Parties' Arguments

On appeal, BoRain argues the jury's adverse finding was supported by some evidence. BoRain further argues that, even if the jury's adverse finding was not supported by some evidence, Hashmi failed to conclusively establish the existence of an agreement between himself and BoRain. BoRain points out that there was no evidence of any contact or discussions between Hashmi and BoRain, much less evidence of the elements necessary to form a contract, that is, offer, acceptance, and a meeting of the minds.

Hashmi counters that there was no evidence to support the jury's failure to find the existence of an agreement between himself and BoRain. Additionally, Hashmi asserts that the evidence conclusively established the existence of either an express or an implied-in-fact contract between himself and BoRain.

### Analysis

Here, the jury found that Hashmi failed to prove the existence of an agreement between him and BoRain. Under the applicable standard of review, we must begin our analysis by

examining the evidence to determine whether the jury's adverse finding is supported by more than a scintilla of evidence. In this step of our analysis, we examine the record for evidence supporting the jury's adverse finding and ignore all evidence to the contrary. *See Walker*, 101 S.W.3d at 745. Again, we consider the evidence and the inferences not as they support the judgment, but as they tend to support the verdict. *Mancorp*, 802 S.W.2d at 228.

At trial, Hashmi testified that he received an email from Rogers telling him that Northeastern had offered to buy the note for $84,788.00. Hashmi agreed to sell the note and he entered into a written purchase agreement with Northeastern to sell the note to Northeastern for $84,788.00. When Hashmi signed the purchase agreement with Northeastern for $84,788.00, he had no idea about any negotiations between Northeastern and BoRain concerning the note. Hashmi was aware that Northeastern could resell the note under the terms of the purchase agreement. By the time the transaction occurred, Hashmi had some knowledge of negotiations with another party concerning the note, but he did not know that these negotiations involved BoRain. Hashmi was not bothered by Northeastern's negotiations with a third party because he had agreed to sell the note for $84,788.00. Hashmi had no communications with BoRain when he signed the purchase agreement or when the closing took place. Hashmi further testified that he did not have an agreement with BoRain.

Rogers, the vice-president of Chaminade Capital, testified that Hashmi contacted her to see if she was interested in purchasing a real estate note and lien from him. Rogers did not purchase the note, but instead brokered the sale of the note to Northeastern. Rogers obtained an offer from Northeastern to buy Hashmi's note for $84,788.00, communicated the offer to Hashmi, and Hashmi accepted it. Hashmi signed a purchase agreement with Northeastern. Rogers further testified that after Northeastern purchased the note and lien from Hashmi, BoRain purchased the note and lien from Northeastern.

The evidence includes several emails between Hashmi and Rogers in which Hashmi informs Rogers that he would like to sell the note, and Rogers informs Hashmi that she has "an offer of $84,788.00 to purchase the whole note." The evidence also includes the purchase agreement between Northeastern and Hashmi. The purchase agreement, which identifies Hashmi as the "seller" and Northeastern as the "buyer," states that Hashmi agrees to sell the note to Northeastern Capital for $84,788.00. BoRain is not mentioned in the purchase agreement.

Additionally, BoRain's chief operating officer, Tommy Lee, testified that he never had any contact with Hashmi or Chaminade concerning the note and lien. According to Lee, BoRain purchased the note and lien from Northeastern; BoRain had no knowledge of any other negotiations concerning the note. Lee was not aware of the negotiations between Northeastern and Hashmi, nor was he aware of Chaminade Capital's involvement. There was no written agreement between BoRain and Northeastern; however, BoRain agreed to pay Northeastern $93,283.71 for the note and lien, and BoRain performed its obligation under this agreement by wiring the purchase funds to Northeastern's attorney. Lee was not aware that Northeastern was buying the note for approximately $84,000.00. Lee added that BoRain would have liked to have purchased the note for $84,000.00 instead of for $93,283.71.

The evidence also includes several documents that tend to show that BoRain purchased the note from Northeastern. One of these documents is an email from Northeastern's attorney to Lee, explaining that he would be working with Northeastern on the purchase of the note, confirming that the purchase price is $93,283.71, and providing wiring instructions for the funds. In another email, Lee responds, "BoRain [f]unding for today, $93,283.71. Please see attached wiring instructions." In another document, BoRain instructs its bank to "wire transfer $93,283.71 pursuant to the attached wire instructions from BoRain."

Finally, West's expert, Sarah Dysart, testified that she had reviewed all of the documents in this case. Dysart agreed that it was fair to characterize the transfer of the note as two separate transactions: one in which Hashmi agreed to sell the note to Northeastern for one price, and a separate transaction and agreement in which BoRain agreed to purchase the note from Northeastern for a different, higher price. During Dysart's cross-examination, the following exchange took place:

Counsel:     But Northeastern never actually obtained the note, as we have discussed?

Dysart:      Well, that is true. There was no transfer directly unto Northeastern, but Northeastern controlled the transaction and paid $84,000 for a note that it appears they resold for 93—.

Counsel:     Well—but they didn't ever acquire it, so they didn't resell it. It just got sold one time, right?

Dysart:      You know, there is a confusion in this transaction because somebody directed West [and] West to transfer the documents directly to BoRain. But if you follow the money, BoRain pays Northeastern for the note, and then Northeastern sends the money to West [and] West.

Counsel:     Right.

Dysart:      And, you know, there are situations where, you know, I can buy a piece of property, sell it, and direct my seller to convey the property to that buyer; but I'm the intermediary buyer. I'm not a broker. So I think, you know, the facts support either situation . . . . the stronger of which is that Northeastern bought the note and resold it, because I think—if Northeastern brokered the note, I think Mr. Hashmi should have some knowledge of the brokerage fees that were paid.

In sum, the evidence showed that Hashmi agreed to sell the note to Northeastern and Northeastern paid for the note as agreed. Additionally, the evidence showed that Northeastern agreed to sell the note to BoRain and BoRain paid for the note as agreed. In light of this evidence, the jury could have concluded that BoRain acquired the note by virtue of an agreement with Northeastern, and not by virtue of an agreement with Hashmi. We conclude the jury's failure to

find the existence of an agreement between Hashmi and BoRain was supported by more than a scintilla of evidence. Because more than a scintilla of evidence existed to support the jury's adverse finding, we need not reach the second step of the analysis, that is, whether the evidence conclusively established the existence of a contract between Hashmi and BoRain. *See Walker*, 101 S.W.3d at 745.

Because the evidence supports the jury's failure to find the existence of a contract between Hashmi and BoRain, it was error for the trial court to grant Hashmi's motion for judgment notwithstanding the verdict. We sustain BoRain's first issue.

## CONCLUSION

In the absence of an agreement between Hashmi and BoRain, Hashmi could not recover on his breach of contract claim against BoRain. We, therefore, reverse the trial court's judgment and render judgment that Hashmi take nothing.

Karen Angelini, Justice