THREE H ENTERPRISES, L.L.C.

v.

ADVANCED ENVIRONMENTAL
RECYCLING TECHNOLOGIES,
INC., et al.

No. A–00–CA–298–AWA.

United States District Court,
W.D. Texas,
Austin Division.

July 16, 2002.

570

Kim E. Brightwell, Vinson & Elkins, L.L.P., William J. Cobb, III, Covad Communications, Austin, Peter G. Rush, Bell, Boyd & Lloyd, Daniel W. Tarpey, Bell, Boyd & Lloyd, Chicago, IL, Gary Ewell, Vinson & Elkins, LLP, Houston, for Three H Enterprises L.L.C., plaintiff.

Charles E. Phipps, Locke, Liddell & Sapp, Roy W. Hardin, Lock Liddell & Sapp, Michael V. Powell, Locke Liddell & Sapp L.L.P., Dallas, for Advanced Environmental Recycling Technologies, Inc., Juniper Industries, Inc., Southern Minerals, Inc., Joseph G. Brooks, Marjorie S. Brooks, defendants.

### *AMENDED MEMORANDUM OPINION AND ORDER*

AUSTIN, United States Magistrate Judge.

Before the Court is the above-referenced case. The parties consented to the jurisdiction of this Court pursuant to 28 U.S.C. § 636(c). After having heard the evidence at trial, reviewed the briefs of the parties, and considered the relevant case law, the Court makes the following findings of fact and conclusions of law.

## I. INTRODUCTION

Three H Enterprises, Inc. ("3H") filed this action against Advanced Environmental Recycling Technology, Inc. ("AERT") on May 9, 2000. A bench trial was conducted on November 13–16 and December 3–6, 2001. The transcript of the trial was filed in its entirety by December 20, 2001. The Plaintiff filed its closing brief on January 7, 2002, the Defendants filed their responsive brief on January 28, 2002, and the Plaintiff filed its reply brief on February 11, 2002.

This matter is before the Court pursuant to 28 U.S.C. § 1332, based on the diversity of the parties' citizenship. 3H is a Chicago-based corporation which has been assigned a claim for breach of a settlement agreement ("Agreement") between 3H's assignors ("Assignors") and the predecessors-in-interest of AERT. The Assignors and AERT's predecessors-in-interest were involved in a joint venture formed to make synthetic fire logs and other products from waste materials. The joint venture was known as "Juniper Products, Inc.," and it had a manufacturing facility in Junction, Texas. Not long after its formation, the joint venture failed, and two separate lawsuits were filed regarding several issues, including the dissolution of the joint venture and the division of assets. The parties reached an agreement to settle the suits in October 1987, which was dictated into the record in an Arkansas court, where one of the lawsuits was filed. By its express terms, the Agreement settled the two cases, and provided for Juniper Industries, or any successor entity to pay a

royalty to Redmar Industries, Inc. on products made using the "confidential information" provided to Juniper during the joint venture. Forgione was to provide a description of the confidential information to the Brookses through his attorney.

Subsequent to the settlement, the parties, through their attorneys, transmitted drafts of written settlement agreements that expanded upon the Agreement dictated into the record in the Arkansas court. The parties never did sign any such document, yet both suits were nevertheless dismissed consistent with the Agreement recited in Arkansas. In addition, 3H's Assignors, through the law firm of Vinson & Elkins, transmitted to AERT's predecessors written materials they claimed constituted the confidential information called for in the above-quoted language. Further, ownership of the Junction facility and related property of the joint venture was ultimately transferred to AERT, which runs the plant today.

3H now claims that the Defendants have breached the provision of the Agreement requiring the payment of "one-half cent per pound on all products produced using the confidential information." AERT contends that the Agreement never formed a binding contract, but that even if it did, the Defendants never violated its terms.

## II. FACTUAL BACKGROUND [1]

In 1980, Philip Forgione, through his company Redmar Investors, Inc. ("Redmar"), patented a process for manufacturing synthetic wood that combined biomass and plastic (the "Erb patent"). Tr. 1:83

(a.m.)[2] and D–14. Shortly thereafter, Redmar started a company in Windsor, New Jersey, called Windsor Synfuel Corporation. Tr. 1:84 (a.m.). The stated business of Windsor Synfuel was the production of firelogs and building materials. Id. Throughout the early 1980s, Forgione teamed with an engineer named James Bookamer to further develop this Erb patent process. Use of ideas developed in the patent led to a process which became known as the "Redmar Process," a process by which Forgione and Bookamer manufactured fire logs and other materials made of plastics and wood fiber. Tr. 1:84–86 (a.m.). In 1984, Forgione was approached by an Arkansas company named Southern Minerals and Fibers, Inc. ("Southern Minerals") that was interested in the business potential of the Redmar Process, and they ultimately began discussing the possibility of a joint venture. Tr. 1:86–88 (a.m.). Southern Minerals was owned and operated by the Brooks family, including two of the named defendants in this case, Joe Brooks and Marjorie Brooks. Tr. 1:88 (a.m.). The proposed joint venture would duplicate the efforts made in Redmar's Windsor Synfuel plant at a Southern Minerals plant in Junction, Texas. Id. In early 1985, after Forgione had refined the Redmar Process and implemented its operation in New Jersey, Joe Brooks, representing Southern Minerals, came to evaluate the operation and determine whether his family's company should start its own operation in Junction, Texas. Tr. 3:147–48 (a.m.). Later, in March of that same year, Forgione met with the

---

**1.** By the nature of this case and the issues presented in it, it is not possible to make a neat separation of the "findings of fact" and "conclusions of law" necessary to the decision. Accordingly, the Court has not so delineated its findings and conclusions in this Memorandum Opinion, and has instead written in a more narrative form. Notwithstanding the Court's choice of format, it believes

that its findings of fact are apparent from the discussion, and will hopefully be apparent to the parties and, should there be an appeal, to the appellate court.

**2.** In the citations throughout these findings, the Court cites first to the transcript volume, then to the page, and, if necessary, designates morning or afternoon.

Brooks family and their lawyers, accountants, and consultants in Texas, bringing with him a piece of his product for inspection. Tr. 1:117–18 (a.m.). Forgione and Southern Minerals eventually signed a formal joint venture agreement in June of 1985. See P–38. The stated purpose of the joint venture company was to manufacture "synthetic firelogs, fuel, building materials and/or other products in accordance with the [Redmar Process]." Id. The gist of the agreement was that Redmar would contribute its technology to the joint venture and would also develop the first manufacturing plant, so that Southern Minerals could learn from Redmar's mistakes before implementing its own manufacturing operation in Junction, Texas. In return, Southern Minerals promised that Redmar would be entitled to an ongoing royalty of "Ten Dollars ($10.00) per ton of product made by the joint venture." Id.; Tr. 1:90–92 (a.m.). The parties also signed a Confidentiality Agreement at that time which described what both parties agreed was Redmar's confidential technology:

> [I]t may be necessary for Redmar ... to provide information with respect to Redmar's business and products, not all of which is generally known by or available to others, including, without limitation, To [sic] technology, manufacturing procedures, designs, processes, formulae, data, specifications, records, patent applications and trade secrets (hereinafter collectively referred to as "Know-how"). Southern Minerals hereby agrees that all Know-how disclosed to Southern Minerals, its officers, directors and employees, will be treated as secret and confidential information and as the sole and exclusive property of Redmar and that such Know-how will be treated in strictest confidence . . . .

See P–38 at AE 05784. The joint venture would become known as Juniper Products, Inc. See P–43; Tr. 5:23–24 (a.m.).

Following the execution of the joint venture agreement in June of 1985, Joe Brooks and his aides spent weeks at Forgione's New Jersey facility learning the Redmar Process under the instruction of Forgione and Bookamer. Tr. 1:124–26 (a.m.); 2:92–94 (a.m.). When not meeting face-to-face in New Jersey, Joe Brooks admits that he was "in constant contact with Forgione" over the telephone and that Forgione traveled to the Junction, Texas, facility "on several occasions to troubleshoot." Tr. 3:21–22 (p.m.). Forgione and Bookamer both testified that they told Southern Minerals "everything" about the Redmar Process. Tr. 2:93 (a.m.); 1:124 (a.m.).

On November 11, 1985, Forgione met with the shareholders and directors of the joint venture company, Juniper Products, and notified them that the future of the Redmar Process was in building materials, not firelogs, and that Forgione was taking his business (Windsor Synfuels) in that direction. See P–43. Joe Brooks, representing Southern Minerals, agreed that at the time of this meeting, as compared to firelogs, producing building materials was the more attractive option. Tr. 3:35–37 (p.m.). A month after this discussion, Forgione invited representatives of Southern Minerals to his New Jersey plant to watch the Redmar Process manufacture building materials during a demonstration for a potential customer named Peachtree Door and Windows. See P–207.

Throughout late 1985 and 1986, Juniper Products struggled to produce firelogs profitably. Tr. 7:65–66. Due to a variety of production and distribution problems, most of which the Brooks family blamed on Forgione, Juniper Products was never able to succeed in the firelog business. Tr. 7:67–70. By January of 1987, the Brooks family decided to discontinue funding the Juniper Products joint venture operation

until they could have "Mr. Forgione out of it." Tr. 5:169. Through their attorneys, the Brooks represented to Forgione that they "would no longer finance the joint venture project in Junction," but that if Forgione would concede "full ownership of the Company to the Brookses," the Company would agree to continue to pay Redmar a royalty. *See* P–48; Tr. 3:74–75 (p.m.). This initial settlement proposal was not accepted, and thus was followed shortly by a formal lawsuit in Texas by the Brookses, accusing Forgione and his company of breaching various obligations. *See* P–167. Another suit in Arkansas was also filed attempting to dissolve Jupiter Products. *See* P–168. Forgione responded by filing a counterclaim against the Brooks family in the Texas action. *See* P–50.

Settlement negotiations continued in March 1987, but by the end of that month, the Brooks family through their attorney Lamar Pettus had "stripped [Juniper Products] of its assets." Tr. 5:82; 6:25. This was accomplished by virtue of liens held by Marjorie Brooks to secure payment of loans to Juniper, which Mrs. Brooks foreclosed. Just over two weeks later, on April 13, 1987, the Brooks transferred those stripped assets to their newly-formed company, Juniper Industries, Inc. *See* P–18; Tr. 6:29. The Brooks family understood that the object of this endeavor was to "continue the business" without Forgione being involved. *See* P–177 at 27–29, 34–36.

During this same period, the Brooks family hired another attorney, Mr. Boyd Cox, to patent the composite wood manufacturing process that they were using at the Junction facility. Tr. 4:12 (a.m.); 3:80, 84 (p.m.). A February 11, 1987 letter from Boyd Cox to Joe Brooks demonstrates that the Brooks family was claiming that the process they intended to patent was not the Redmar Process they had been taught by Forgione, but was a new invention de-

veloped by an Arkansas firm named Bargo Engineering. *See* P–200. However, Joe Brooks admits that as of November 1, 1987, he had not "added significantly" to "Forgione's technology." Tr. 3:98 (p.m.). Furthermore, a federal district court in Delaware, in deciding whether AERT's patent on its manufacturing process was valid, found that Forgione's Redmar Process (based upon his Erb patent) was the foundation of the process that AERT claimed was developed by Bargo Engineering in their patent application. *See Mobil Oil Corp. v. Advanced Environmental Recycling Technologies, Inc.*, 869 F.Supp. 251 (D.Del.1994).

On October 27, 1987, the Brookses' Arkansas lawsuit to dissolve Juniper Products proceeded to trial. However, just before trial commenced, the parties conducted settlement negotiations for at least an hour with "discussions back and forth" and Pettus shuttling "back and forth" to "talk to [the Brooks] and then talk to the other side." Tr. 7:106. These negotiations ultimately resulted in a settlement agreement being dictated into the record of the Court. Tr. 5:77–78. Joe Brooks, Jim Brooks, and Marjorie Brooks were all in attendance and participated in the negotiations. *See* P–32; Tr. 4:35–36 (a.m.). The central point of the settlement agreement was stated by the Brookses' attorney as follows:

> What the parties have agreed to do in order to resolve all of the controversies and litigation among themselves is that Juniper Industries, Inc. or whatever entity or whoever operates a manufacturing and production plant in Junction, Texas, which produces product by using polymers and cedar fiber, will pay a royalty of one-half cent per pound on all products produced using the confidential information, the description of which will be supplied by Redmar Industries, Inc.

through the law firm of Vinson and Elkins.

*See* P–32 at 5. The parties agreed that the Agreement would resolve the Texas litigation as well. *Id.* at 2. Both lawsuits were indeed subsequently dismissed.

The present suit is 3H's effort to enforce the Agreement. 3H claims that this dictated settlement agreement is an enforceable contract that has been breached by AERT because the royalties promised to Redmar Industries were never paid.

## III. ANALYSIS

3H's amended complaint includes two causes of action—Count One, which alleges a breach of contract claims against AERT, and Count Two, which alleges a similar breach of contract claim against the "Brooks Group" (Juniper Industries, Southern Minerals, Joe Brooks, and Marjorie Brooks). The Court will analyze each claim separately.[3]

### A. THE BREACH OF CONTRACT CLAIM AGAINST AERT [4]

■ The essential elements of Plaintiff 3H's breach of contract claim under Texas law are: "(1) that a valid contract existed; (2) that the plaintiff performed; (3) that the defendant breached; and (4) that the plaintiff suffered damages as a result." *Perry Williams, Inc. v. FDIC*, 47

F.Supp.2d 804, 810 (N.D.Tex.1999) (*citing Scott v. Sebree*, 986 S.W.2d 364, 372–73 (Tex.App.—Austin 1999, pet. denied)). As the plaintiff, 3H bears the burden of proof as to each of these elements of its cause of action.

Defendant AERT makes several arguments as to why 3H has failed to prove the elements of its claim for breach of contract. First, AERT contends that the settlement agreement was not an enforceable contract because there was no "meeting of the minds" at the time of its creation. AERT also argues that the Statute of Frauds prohibits enforcement of the settlement agreement. In addition, AERT maintains that Forgione's own material non-compliances with the agreement bar its enforcement. Furthermore, AERT claims that the agreement was not a contract, but was merely an "agreement to agree." AERT argues alternatively that even if a contract was formed, 3H failed to prove that AERT used any "confidential information" at its Junction facility. AERT also contends that 3H failed to present evidence at trial that properly establishes the amount of royalty owed by AERT for past damages under the settlement agreement. Finally, AERT argues that 3H's claims are barred by the doctrine of laches.

---

**3.** The parties' closing briefs never explicitly mention the liability theory raised by Count Two (although Plaintiff's briefs discuss the evidence related to Count Two in some detail). Accordingly, the Court's discussion of Count Two is similarly brief.

**4.** In its earlier motion for summary judgment, AERT argued that it could not be liable for any breach of the Agreement because it was not a party to the Agreement, and was not a successor to any party to the Agreement. The Court denied summary judgment on that issue, finding that fact questions remained for trial on that defense. Clerk's Doc. No. 141 at 8–10. At the start of trial, AERT decided that

"in order to narrow the issues down" and "focus on what we believe is important," it would "drop its defense of no liability based upon the fact that it is not a corporate successor..." and stipulated "for purposes of this proceeding only, and for no other purpose whatsoever, that should the Court find the defendants liable, AERT will be responsible for any final judgment after any and all appeals." Tr. 1:19–20 (a.m.). Accordingly, AERT has conceded for the purposes of this trial that in the event the Agreement is found to be an enforceable contract which has been breached through the failure to pay royalties, AERT is appropriately held liable for any such breach.

### 1. Was There a Meeting of the Minds?

■ AERT's first argument concerning the enforceability of the Agreement is that there was no "meeting of the minds" regarding the "confidential information" for which AERT was required to pay royalties if used by AERT. 3H argues that the Agreement's language was unambiguous: the description of the "confidential information" was to "be supplied by Redmar Industries, Inc., through the law firm of Vinson and Elkins." *See* P–32 at 3. Therefore, 3H contends, the document entitled "Redmar's Licensed Technology" which was delivered to the Brooks group just days after the Agreement was created, is the description of the "confidential information" that the Agreement required. *See* P–51 & P–52. AERT argues that the Brooks family never intended for this language to be understood in this way. Rather, AERT claims that the Brookses' attorney, Lamar Pettus, when creating this Agreement, understood that the "confidential information" to "be supplied by Redmar" referred to a document already in existence, not one that was to be put together after the Agreement was made. AERT argues that both parties knew on October 27, 1987 (the date of the Agreement), that the description of the "confidential information" already existed as a sealed exhibit to Forgione's August 1987 deposition in the Texas lawsuit. Both Joe Brooks and Lamar Pettus testified at trial that this was their understanding at the time of the Agreement. Tr. 5:72, 80–81; 7:107–108; 4:37–38 (a.m.). Although that sealed exhibit has been ruled privileged and is therefore inadmissible in this trial, Lamar Pettus did testify that the description of Redmar's "confidential information" found within that sealed document was

distinct from the "Redmar's Licensed Technology" document that Forgione ultimately produced after the Agreement in October 1987. Tr. 6:69–70. When asked how the two documents were different, Pettus responded that the "Redmar's Licensed Technology" document included "compatible" thermoplastic waste materials, as opposed to the older sealed document, which as he remembered it, included only "noncompatible" thermoplastic waste materials. *Id.*

The Court does not find this argument compelling. The evidence in this trial does not support AERT's claim that Pettus and the Brookses understood the term "confidential information" to refer to the sealed document from the Forgione deposition. Just days after the Agreement, Lamar Pettus wrote a letter to Forgione's attorney, Kim Brightwell, instructing him to have "Clark Martin get the technology to us." *See* P–33. Clark Martin was an intellectual property attorney located in Houston (not Austin), was not principal counsel to Redmar, and had no involvement in the Forgione deposition where the document was sealed. If Pettus truly thought that the description of the technology already existed in that sealed document, it is unclear why he would have been requesting the description from an attorney who had no connection to it. The Court finds that Pettus' request to have Clark Martin provide a description of the technology supports 3H's claim that at the time of the Agreement, both parties understood that the description had not in fact been completed yet.

Moreover, in Pettus' first writing after receiving the "Redmar's Licensed Technology" document, Pettus never even mentions the sealed document to which he now refers.[5] *See* P–59. If, as Pettus claimed in

---

5. In fact, he never mentions that Redmar's Licensed Technology inaccurately describes the Redmar Process, much less that "compat-

ible" plastic should not have been included in the description. *See* P–59.

testimony, the "Redmar's Licensed Technology" document was significantly different than the description contained in the older sealed document, and he was under the impression that the sealed document was the description intended by the Agreement, one would think that his immediate response would have pointed this out. His failure to do so undermines the credibility of his current testimony. Furthermore, if, as he claimed, Mr. Pettus had intended for the term "confidential information" to refer to the sealed document, he would surely have expressly stated this in the Agreement itself. As Mr. Pettus' testimony made clear, he was well aware of the existence of the sealed exhibit, and it would have been very easy for him to have stated the agreement as a covenant that Juniper or its successors would pay a royalty based on products made using the technology described in the "sealed exhibit to the August 1987 deposition of Mr. Forgione." Instead, he stated that his clients agreed to pay a royalty for products made using the "confidential information, the description of which will be supplied by Redmar Industries, Inc. through the law firm of Vinson and Elkins." These are two very different things. Given that Mr. Pettus is an able attorney, and that the agreement was the result of significant negotiations, the Court finds the testimony that the Brookses' intent was to have the agreement cover only the information contained in the sealed exhibit from the deposition not credible.

■■■ As stated earlier, the Court finds that the evidence does not support AERT's argument that at the time of the Agreement, the Brooks group understood the already-existing sealed deposition document to be the "confidential information" to which the Agreement referred. What is much more likely is that AERT simply disagreed with the description of "confidential information" that Redmar ultimately gave them. However, this has nothing to do with the issue of whether the Agreement gave Redmar the non-negotiable right to describe their technology. The fact is, in its "no meeting of the minds" argument, AERT ignores much of what was actually said in court by the parties. Those statements, which demonstrate a very clear intention to enter into a contract, are in the Court's view the most important evidence on the question of whether the parties had a "meeting of the minds." Texas law is quite clear: "the determination of the meeting of the minds ... that is required for contract formation is based on the objective standard of what the parties said and did and not on their subjective state of mind." *Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex.App.—San Antonio 1999, pet. denied). When the Court looks objectively at what the parties said and did, a "meeting of the minds" is readily apparent. For example, as the Court noted in its prior summary judgment order:

[A]t the time of the Agreement, Mr. Pettus, the attorney representing the Brooks and Southern Minerals, Inc., stated that:

We're going to dictate into the record a settlement agreement in the Chancery Court of Washington County, Arkansas, in the [Arkansas case]. It's also our intent that this settlement will apply to and be binding in the lawsuit pending in the [Texas case].

Then, Mr. Pettus, after identifying all of the parties who were present, and immediately before stating what the terms of the Agreement were, stated that this was "[w]hat the parties have agreed to do in order to resolve all of the controversies and litigation among themselves." These are not the words of a party that has not had a "meeting of the minds" with his co-contractor. Indeed, far from being a case in which it is less than clear whether the parties intended

to bind themselves to an agreement, this is a case in which AERT's incorporators were present in the courtroom when their attorneys recited the terms of an agreement that was expressly stated to be a binding contract to resolve two pending lawsuits.[6] Each party spoke through their representative to clarify the terms of the Agreement in certain particulars, and no one expressed any doubt that the stated terms were not final and binding.

See Clerk's Doc. No. 141, pp. 14–15. While the Agreement's granting to Forgione the right to describe the technology may have turned out to be unfortunately broad for AERT, that does not mean that there was not a "meeting of the minds" in the Agreement's formation.

AERT argues that it would be absurd and unreasonable to hold that the Agreement gave Forgione a non-negotiable right to define his technology. Because the history of settlement negotiations preceding the Agreement was apparently characterized by pervasive mistrust between the parties, AERT contends that it would be illogical to presume that the Brooks group would have agreed to allow Forgione to unilaterally define the "confidential information" for which Redmar was to be paid. However, although the Agreement granted Redmar the unilateral right to describe its own technology, the Agreement itself was clearly formed under bilateral conditions. In return for settling their disputes by way of this Agreement, the Brooks group was released from costly and protracted litigation in both Texas and Arkansas. It is entirely reasonable to assume that when making this Agreement, the Brooks group deemed settlement of the disputes more important than haggling over the description of the Forgione technology. In fact,

months before he received the description of the technology from Forgione, Pettus had both instructed Joe Brooks "not to quibble with" a reasonable description of the technology, and assured counsel for the Forgione group that the Brookses would not "quibble with" such a description. Tr. 6:22.

As stated above, Texas law requires that "meeting of the minds" be determined by way of what the parties said and did and not their subjective state of mind. See again Copeland, 3 S.W.3d at 604. With this standard in mind, the Court finds that the objective evidence in this case demonstrates that the parties had a "meeting of the minds" during the formation of this Agreement.

## 2. Does the Statute of Frauds Prohibit Enforcement of the Agreement?

■ AERT also argues that the Statute of Frauds prohibits enforcement of the Agreement. However, AERT did not raise this affirmative defense until mid-trial, after 3H had presented all of its witnesses. As such, 3H has submitted a Motion to Strike AERT's Statute of Frauds defense as untimely. AERT contends that they are allowed to add a new affirmative defense at this late stage for two alternative reasons: (1) because 3H amended its complaint to include a claim for attorneys' fees; and (2) because the Statute of Frauds issue was tried by consent.

As both parties acknowledge in their briefing on this issue, Rule 15 of the Federal Rules of Civil Procedure governs the amendment of pleadings. AERT's first argument in support of its amendment is based upon subsection (a) of Rule 15,

---

**6.** Although Mr. Forgione was not present, all of the Brooks parties were in attendance

when the Agreement was recited.

which provides that a party may "plead *in response to* an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleadings ..." (emphasis added). AERT contends that because 3H amended its complaint to include a claim for attorneys' fees, Rule 15(a) allows AERT to respond by amending its pleadings to include a new affirmative defense based upon the Statute of Frauds. The Court does not agree. AERT's new Statute of Frauds defense has absolutely nothing to do with 3H's request for attorneys' fees. Certainly, AERT cannot claim under Rule 15(a) that it is pleading the Statute of Frauds amendment "in response to" 3H's claim for attorneys' fees. The unreasonable argument that AERT makes is that because the Court allowed 3H to add a claim for attorneys' fees, AERT then had *carte blanche* to introduce a never-before-seen affirmative defense in the middle of the trial, a defense completely unrelated to 3H's amendment. This would be entirely inconsistent with the purpose for Rule 15, which is to ensure that both parties are able to adequately prepare for their opponent's legal arguments. The Supreme Court has made clear that leave to amend should not be given if it is apparent that "undue prejudice to the opposing party" will result. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Clearly, AERT has significantly hampered 3H's ability to elicit testimony and evidence in response to this newly-proposed Statute of Frauds argument. The Court finds that if AERT is allowed to add this defense at such a late stage, 3H would suffer "undue prejudice."

■ AERT argues alternatively that they should be allowed to add a Statute of Frauds defense because the issue was tried by consent. Subsection (b) of Rule 15 allows pleadings to be amended to conform to the evidence elicited at trial, even after judgment. AERT points out that during trial, they elicited testimony from Lamar Pettus and Joe Brooks that the Agreement would last for more than one year and that there was no written agreement. Because 3H did not object to such testimony, AERT contends that the Statute of Frauds issue was tried by either express or implied consent.

■ The record clearly shows no "express" consent to the trial of the Statute of Frauds issue, so the question becomes whether 3H's lack of objection should be construed as "implied" consent. The Court finds that it should not. According to the Fifth Circuit, trial of an issue "by consent" can only occur if "the parties recognized that the unpleaded issue entered the case at trial." *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 332 (5th Cir.1994). A review of the testimony that AERT claims was sufficient to raise the Statute of Frauds issue does not persuade the Court that 3H recognized, or even should have recognized, that the Statute of Frauds was being tried. Of the several hundred pages of trial testimony, including thousands of questions and answers, AERT's only cognizable reference to the Statute of Frauds issue is found in a single question and answer comprising roughly two and a half lines of transcript.[7] This can hardly be described as a "trial" of the Statute of Frauds issue. Furthermore, any evidence relating to the duration of the royalty obligation is also relevant to the damages due 3H—yet another reason why 3H would not have objected to the testimony. *See id.* (quoting *Haught v.*

---

7. Tr. 5:91 (Q. "Did you contemplate that this agreement ... would last for more than one year?" A. "Yes, sir.").

*Maceluch,* 681 F.2d 291, 305 (5th Cri. 1982)) ("If the evidence overlaps in this fashion, it does not equate to implied consent 'absent a clear indication that the party who introduced the evidence was attempting to raise a new issue.' "). Accordingly, the Court finds that the Statute of Frauds issue was not tried by either express or implied consent.

■ In consideration of the "undue prejudice" that such an untimely defense would cause the Plaintiff, 3H's Motion to Strike Defendants' New Affirmative Defense (Clerk's Doc. No. 180) is GRANTED, and an analysis of the Statute of Frauds issue itself is therefore unnecessary.[8]

### 3. Did Forgione Fail to Comply With the Agreement In a Way That Would Bar Enforcement of the Agreement?

■ AERT's next contention is that the Agreement should not be enforced against them because the Forgione group failed to fulfill their obligations under the Agreement. *See Dobbins v. Redden,* 785 S.W.2d 377, 378 (Tex.1990) ("It is a well established rule that 'a party to a contract who is himself in default cannot maintain a suit for its breach.' "). The allegedly failed obligations include: (1) an executed release from Forgione to the Brooks group, (2) a transfer to the Brooks group of all the Forgione group's stock in Juniper Products, Inc., and (3) resignations of the Forgione family members from their positions as officers and directors of Juniper Products, Inc. Tr. 5:86–88, 136. 3H does not dispute that Forgione never carried these obligations out.

3H does deny, however, that Forgione failed to comply in a material manner with any essential term of the Agreement. The Fifth Circuit has defined an "essential" term as "one that... the parties reasonably regarded, at the time of contracting, as a vitally important part of the bargain. Failure to fulfill such a promise, in other words, would seriously frustrate the expec-

---

**8.** However, the Court would note that even if AERT had raised this defense in a timely manner, the Court would not have found it meritorious. Frankly, it seems odd that the defendants attempt to argue that the Agreement's lack of signatures renders it unenforceable in this Court, when it was this same Agreement that was entered in this same Court in 1988 to resolve the parties' lawsuit here. Furthermore, the Court stands by its earlier ruling that a settlement agreement dictated into the court record is not considered unenforceable merely because no signatures were affixed thereto. *See* TEX. R. CIV. P. 11 (providing that an agreement is enforceable if *"it be made in open court and entered of record."*) (emphasis added); *United States v. Katy Indep. Sch. Dist.,* 333 F.Supp. 1325, 1330 (S.D.Tex.1971); *Main Line Theatres, Inc. v. Paramount Film Distributing Corp.,* 298 F.2d 801, 803 (3rd Cir.), *cert. denied,* 370 U.S. 939, 82 S.Ct. 1585, 8 L.Ed.2d 807 (1962); *Carden v. McDonald,* 69 Ark.App. 257, 12 S.W.3d 643, 647 (2000) ("When [the settlement agreement] was dictated into the record of the hearing, it became valid and binding on all

parties."); *Infante v. Bridgestone/Firestone, Inc.,* 6 F.Supp.2d 608, 610 (E.D.Tex.1998) (applying Texas law) ("once a Settlement Agreement is read into the record in open court, it becomes enforceable.").

In addition, AERT admits that the Agreement "does not fix its duration." AERT's Closing Argument, p. 40. To carry their burden of proof on a Statute of Frauds defense, AERT had to show that the contract could not be performed within one year. *Beckstrom v. Gilmore,* 886 S.W.2d 845, 846 (Tex.App.— Eastland 1994, writ denied) ("[W]here the parties do not fix the time of performance and the agreement itself does not indicate that it cannot be performed within one year, the contract does not violate the [Statute of Frauds]."). AERT did not introduce such evidence, and indeed, the nature of the Agreement seems to imply that it could have been performable within one year. The Agreement's royalty obligation would have been fully performed as soon as the defendants stopped using Redmar's Licensed Technology, which certainly could have occurred within a year.

tations of one or more parties as to what would constitute sufficient performance of the contract as a whole." *Conner v. Lavaca Hosp. Dist.*, 267 F.3d 426, 433 (5th Cir.2001) (quoting *Neeley v. Bankers Trust Co.*, 757 F.2d 621, 628 (5th Cir.1985) (applying Texas law)). As the Court has already ruled in its summary judgment order, none of the contractual items that went unperformed by Forgione were "vitally important" to the contract as a whole; they were mere formalities. Moreover, the evidence at trial demonstrated that at least one of the three contractual items, the execution of the mutual release, was indeed fulfilled. Just days after the Agreement was dictated into the court record in October 1987, Forgione's attorney for the Agreement, Kim Brightwell, submitted to the Brooks group a written "Mutual Release," which was subsequently refused by the Brookses. *See* P–51; P–59 at 3H002623. Forgione cannot be faulted for failing to execute a release that he actually prepared and submitted to the Brookses, and which they then rejected.[9]

AERT also claims that the Agreement required the Forgione group to deliver written resignations from the board of Juniper Products, and that the failure to do so was a material breach of an essential term of the Agreement, rendering it unenforceable against the Brooks group. The Court also finds that delivery of written resignations, beyond the resignations that the Agreement itself made effective, was not a "vitally important part of the bargain." The Agreement stated: "it is agreed that the current Board members of Juniper Products, Inc., specifically Philip Forgione, Patricia Forgione, and Gabrielle McQuiston. will resign their positions as officers and Board of Directors members of Juniper Products, Inc." P–32 at 8. Here, the Agreement itself serves as an effective resignation on the part of the Forgione group. In fact, the Brookses' actions subsequent to the Agreement demonstrate that delivery of written resignations beyond the Agreement itself was highly unnecessary, if not useless. First of all, Pettus, the Brookses' attorney, wrote a letter on the Monday following the settlement agreement telling Forgione's attorney that he would draft whatever resignations he deemed necessary. No resignations were then ever submitted by Pettus to Forgione or his counsel, however. Furthermore, the evidence shows that Juniper Products was completely stripped of its assets by late March 1987. Tr. 6:24–25. So completely had Juniper Products been divested, Pettus claimed that "for all practical purposes, [it was] dissolved." *See* P–19. In the Court's opinion, even if the Agreement itself did not contain language that implemented the resignations, the failure to execute formal resignations from an admittedly defunct and effectively dissolved company would not "seriously frustrate the expectations of one or more parties as to what would constitute sufficient performance of the contract as a whole." *See*

---

9. Regardless of whether Forgione fulfilled his obligation concerning the release, it is doubtful from the evidence that the release was an "essential" term of the contract. The Agreement required that:

All parties in the Texas lawsuit and Juniper Industries, Inc., all parties in the Arkansas lawsuit will execute mutual releases, by which each relieves the other party which might have any interest which is adverse to it, releases and forever forgives any causes of action or any type of action one might have against the other; all of which have arisen before this date.

P–32 at 6. The evidence demonstrated that consistent with the Agreement the parties actually dismissed all claims against each other pending in the two lawsuits. There was no evidence at trial that there were other claims, not pending in the two lawsuits, which necessitated a separate release to surrender. Given this, re-executing another later mutual release would have been a less-than-"vital" formality.

*Conner,* 267 F.3d at 433. Here, as with the mutual release requirement, no "essential" term of the Agreement has been violated in a way that would bar its enforcement.

The third unfulfilled contractual obligation that AERT complains of refers to the Agreement's provision regarding Juniper Products' stock. The Agreement reads: "The Texas Venture Corp. [Forgione's group] will assign or transfer all of its shares of stock and deliver the certificates of stock which it might have in Juniper Products, Inc. to Southern Minerals, Inc." *See* P–32 at 6. Here, as above, the Court finds that even if the Agreement itself did not effectively assign the Forgione group's stock, because Juniper Products had been essentially dissolved and lifeless for over six months before the Agreement was dictated, any formal assignment or transfer of stock ownership would have been a practically useless endeavor. As such, failure to assign the stock would not "seriously frustrate the expectations of one or more parties as to what would constitute sufficient performance of the contract as a whole." *See Conner,* 267 F.3d at 433.

**4. Was the Settlement Agreement Merely An "Agreement to Agree"?**

In another effort to dispute the Agreement's enforceability, AERT argues that the dictated settlement was nothing more than an "agreement to agree," which would be unenforceable under Texas law. *See Copeland v. Merrill Lynch & Co., Inc.,* 47 F.3d 1415, 1425 (5th Cir.1995). An unenforceable "agreement to agree" is one in which "material" or "essential" terms of an agreement are left open to be negotiated and agreed upon in the future. *See Fort Worth Indep. Sch. Dist. v. City of Fort Worth,* 22 S.W.3d 831, 846 (Tex.2000); *Gerdes v. Mustang Exploration Co.,* 666

S.W.2d 640, 644 (Tex.App.—Corpus Christi 1984, no writ). AERT contends that the parties never intended that the dictated settlement agreement would be a contract. Instead, AERT claims, the Agreement was merely to outline parts of a subsequent contract that they intended to negotiate, review, and then have their clients approve and sign.

The Court does not agree. In support of their argument that the settlement was nothing but an "agreement to agree," AERT relies heavily upon the testimony of Lamar Pettus, the Brooks attorney who dictated the settlement into the record after negotiating its terms with the Forgione group. Although Pettus did indeed testify at trial that he did not consider the settlement to be anything other than an "agreement to agree," [10] the Court notes that it is in Pettus' interest to remember the settlement in this way. Furthermore, the evidence does not support his memory. The Agreement itself described a substantially detailed and completely bilateral contract, including all essential terms. In fact, although Pettus testifies now that he did not regard the settlement that he brokered and dictated into the record as a binding agreement, the very words that he used that day demonstrate that the opposite was true: he (and, in turn, those he represented) understood that his clients were entering into a binding agreement. Pettus himself opened the settlement statement with the following:

"We're going to dictate into the record a settlement *agreement* in the Chancery Court of Washington County, Arkansas, in the case of Southern Minerals, Inc. versus Juniper Products, Inc. and Texas Venture Corporation.... It's also our intent that this settlement will apply to and be *binding* in the lawsuit pending in

**10.** Tr. 5:90.

the 198th Judicial District of the State of Texas." (emphasis added)

*See* P–32 at 2. Pettus then went on for five pages describing in detail the terms of the Agreement, concluding with the statement "[i]s that your understanding of our *agreement*, Mr. Brightwell?" (emphasis added). *See* P–32 at 6. This five-page description was followed by a multiple-page clarification of the terms by way of questions and answers between the opposing parties. In the seven full pages of the transcribed settlement, Pettus consistently refers to the settlement as the parties' "agreement." There is never even an allusion to the term "agreement to agree" or anything remotely similar. Indeed, in correspondence with the Forgione group almost five months after the settlement, Pettus provided even more evidence that he and his clients understood that they had entered a binding "agreement." In his letter dated February 23, 1988, Pettus wrote that "[i]f Juniper Industries or its assignees uses the confidential process provided by Redmar, then royalties are due and can be forced under the *agreement* ..." (emphasis added). *See* P–59 at 3. Pettus then clearly conceded that the Agreement contained all essential terms:

> "I will have my clients sign the stipulation as typed by the clerk, add a paragraph which says this is our agreement. You can have your clients sign it. *Then we have a contract.*" (emphasis added)

*Id.* If Pettus was under the impression that what he dictated into the record did not include an agreement concerning all of the essential terms of the contract, it is unclear why he would have admitted here that the "agreement" included all but formal signatures in order to be "a contract."

Finally, the Court notes that Pettus and the Brookses not only claimed in the actual settlement language that this agreement was "binding," but they agreed to the dismissal of both pending lawsuits in Texas and Arkansas by fully relying upon the provisions of the Agreement. They did not wait for any "essential" terms to be negotiated in the future. They relied immediately and exclusively upon the settlement dictated into the record on October 27, 1987, to resolve their dispute with Forgione. If this settlement was not an effective contract at the time, it is unclear why it could have been effective in getting the parties to release the claims they had against each other.[11]

In light of the foregoing, the Court finds that weight of the evidence does not support AERT's assertion that the settlement agreement was merely an "agreement to agree." Evidence both inside and outside the language of the Agreement itself reveals an understanding by both parties that by entering the Agreement, they were entering a binding contract that could be readily relied upon.

### 5. Did 3H Fail to Prove That AERT Used Any of Redmar's "Confidential Information" At Its Junction Facility?

■ AERT argues that even if the Agreement formed a valid contract, 3H did not prove that AERT used any "confidential" Redmar technology, and therefore, AERT does not owe any royalties under

---

**11.** In fact, AERT's most recent public Form 10–Q filing on November 14, 2001, openly acknowledges that:

> "Under the 1987 settlement *agreement*, our founders *agreed* to pay a royalty of $10 per ton on products, if any, produced in or within 500 miles of Junction, Texas, if such

products were produced using confidential information of [Forgione/Redmar]." (emphasis added)

*See* P–205 at 20. This hardly seems consistent with AERT's present contention that the Brookses' only agreement under the 1987 settlement was that they would agree later.

the Agreement. First of all, AERT contends that since the Agreement requires a royalty payment for use of Redmar's "confidential" information, AERT cannot be required to pay for any technology that was "public information," because that would be inconsistent with the "common understanding" of the term "confidential." Furthermore, AERT maintains that they do not use any of the "specific" information that Forgione describes in the "Redmar's Licensed Technology" document.

The Court rejects AERT's argument that the use of the term "confidential" means that AERT cannot be required to pay for any of Redmar's technology that was ever public knowledge. Nowhere did the parties agree that the "confidential information" had to achieve trade secret status to entitle Forgione to a royalty. Indeed, it is plain from the language of the Settlement Agreement that the parties were merely describing a category of information that, if used by the Brookses, would obligate them to pay Forgione a royalty, and there is no evidence that anyone from the Brookses' side ever expressed that they were intending to limit their obligation based on notions of trade secret law.[12] The Court finds that the term "confidential information" was not meant to be a requirement that the information had to be a trade secret, or some other legally recognized form of secret information.[13] The term was merely a convenient way to describe what both parties understood to be Forgione's technology.

As to whether AERT actually uses any of Redmar's Licensed Technology, the evidence speaks for itself. The evidence at trial revealed that in early 1985, after Forgione had refined the Redmar Process and implemented its operation in New Jersey, Joe Brooks, representing Southern Minerals, came to evaluate the operation and determine whether his family's company should start its own operation in Junction, Texas. Tr. 3:147–48 (a.m.). Later, in March of that same year, Forgione met with the Brooks family and their lawyers, accountants, and consultants in Texas, bringing with him a piece of his product for inspection. Tr. 1:117–18 (a.m.). Forgione and Southern Minerals eventually signed a formal joint venture agreement in June of 1985. *See* P–38. The stated purpose of the joint venture company was to manufacture "synthetic firelogs, fuel, building materials and/or other products in accordance with the [Redmar Process]." *Id.* The gist of the agreement was that Redmar would contribute its technology to the joint venture and would also develop the first manufacturing plant, so that Southern Minerals could learn from Redmar's mistakes before implementing its own manufacturing operation in Junction, Texas. *Id.*

Following the execution of the joint venture agreement in June of 1985, Joe Brooks and his aides spent weeks at Forgione's New Jersey facility learning the Redmar Process under the instruction of

---

**12.** Rather, the parties were using the phrase much like their use of the same phrase in their June 1985 confidentiality agreement, where the parties explicitly agreed that the term "confidential information" simply referred to the "know-how" of Redmar, "not *all of which* is generally known by or available to others ...," *see* P–38 at AE05784 (emphasis added), which clearly shows that the parties agreed in 1985 that at least some of what they regarded as confidential at that time was "known by or available to others."

**13.** As 3H has pointed out, this definition of "confidential information" may even be consistent with the legal definition of a "trade secret." *See Rivendell Forest Products, Ltd. v. Georgia–Pacific Corp.*, 28 F.3d 1042, 1046 (10th Cir.1994) (finding a trade secret "where the elements are in the public domain, but there has been accomplished an effective, successful, and valuable integration of the public domain elements").

Forgione and Bookamer. Tr. 1:124–26 (a.m.); 2:92–94 (a.m.). When not meeting face-to-face in New Jersey, Joe Brooks admits that he was "in constant contact with Forgione" over the telephone and that Forgione traveled to the Junction, Texas, facility "on several occasions to troubleshoot." Tr. 3:21–22 (p.m.). Forgione and Bookamer both testified that they told Southern Minerals "everything" about the Redmar Process. Tr. 2:93 (a.m.); 1:124 (a.m.). Some of the specific instructions that were provided to Southern Minerals, before and after the joint venture agreement, included the following:

1) Forgione instructed Southern Minerals to buy the Chromalox hot oil system AERT still uses in Junction today. *See* P–41; Tr. 3:168–172 (a.m.).

2) The layout of the Junction plant was designed similar to the New Jersey plant under Forgione's guidance and input. Tr. 3:167 (a.m.).

3) After testing a cedar fiber sample that Southern Minerals sent to Forgione, it was explained to Southern Minerals that the cedar fiber was too moist to produce burnable logs, and therefore they would need to install the second "In–Line Drying System" now used by AERT in Junction. *See* P–121; Tr 1:94–97; 3:49–52 (p.m.).

4) Forgione negotiated and purchased the three Baker–Perkins mixers AERT uses in Junction today. Tr. 3:167–68 (a.m.); 1:127–28 (a.m.).

5) Forgione selected the current Farrel extruder used in Junction, and Bookamer instructed Southern Minerals to shorten and cool the barrel of the extruder in order to achieve better production results. *See* P–87; P–154; Tr. 1:132 (a.m.); 1:9–10 (p.m.); 2:129–31, 141–45 (a.m.); 3:46–49 (p.m.).

6) Bookamer instructed Southern Minerals to grind their cedar fiber with a hammermill in order to attain smaller and more effective particles. This hammermill is still in use today at the Junction facility. Tr. 2:108–10 (a.m.); P–179 at 372.

7) Forgione and Bookamer trained Southern Minerals regarding the cooling of extruded building products by way of conveyors and ambient conditions. Tr. 1:30–31, 176–77 (p.m.); 2:153–56 (a.m.).

On November 11, 1985, Forgione met with the shareholders and directors of the joint venture company, Juniper Products, and notified them that the future of the Redmar Process was in building materials, not firelogs, and that Forgione was taking his business (Windsor Synfuels) in that direction. *See* P–43. Joe Brooks, representing Southern Minerals, agreed that at the time of this meeting, as compared to firelogs, producing building materials was the more attractive option. Tr. 3:35–37 (p.m.). A month after this discussion, Forgione invited representatives of Southern Minerals to his New Jersey plant to watch the Redmar Process manufacture building materials during a demonstration for a potential customer named Peachtree Door and Windows. *See* P–207.

Today AERT exclusively produces building materials, admitting that they rely at least in part upon the information contained in the "Redmar's Licensed Technology" document. *See* Defendant's Closing Argument, p. 48. Although AERT has shown that the process they currently use is also based upon their own development and refinement of Redmar's process, this does not negate the fact that AERT based its current manufacturing operation upon Redmar's Licensed Technology, a process that Forgione and Bookamer developed and then taught to the Brooks family, all in reliance upon the promise that they would ultimately be able to share in any

future profits received by way of the process. Certainly, AERT's current process bears distinctions from the technology described by Redmar in the 1987 Agreement, but the process is also clearly founded upon the basics of Redmar's "know-how." Joe Brooks admitted at trial that the AERT facility in Junction uses the following aspects of Redmar's Licensed Technology:

1) reprocessed, second-hand low density polyethylene (Tr. 4:90–91 (a.m.));

2) polyethylene binding with cedar fiber (*id.* at 92–93);

3) contracting with manufacturers to obtain reprocessed plastic followed by raw material evaluation (*id.* at 93–94);

4) cedar fiber obtained from local mills, the moisture content of which is carefully monitored (*id.* at 94–95);

5) using a formula with the 30%—70% plastic vs. 70%—30% wood fiber range (*id.* at 99);

6) mixing temperatures (275 to 285 ) falling within the ranges identified in P–52 for the Tuff Timbers (*id.* at 99–100);

7) the idea for making "decking" (*id.* at 100–01);

8) a hot oil jacketed system with oil transferred with the aid of a pump (*id.* at 102–104);

9) electricity powered heaters (*id.* at 104–05);

10) a heating element operating range falling within 200 to 550 (*id.* at 105–06);

11) hot oil circulating throughout jackets encasing "double arm" mixers (*id.* at 106–07);

12) maintaining the composite's heat after it is mixed (*id.* at 108–09);

13) bucket elevators, screw augers, screw conveyor, water-tight storage systems and a dust collection system (*id.* at 110);

14) extruding the composite out of a Farrel extruder with heat exchange capabilities on the barrel (*id.* at 110–11);

15) use of a variable speed drive to control the speed at which the composite is processed along with final forming die (*id.* at 112–13).

James Bookamer, Forgione's former employee and co-developer of the Redmar Process, testified that he taught the Brookses the process described in Redmar's Licensed Technology and that AERT continues to use Redmar's Licensed Technology today. Bookamer identified all of the following identities between Redmar's technology and the process used by AERT at the Junction facility:

1) use of wood biomass (Tr. 2:108 (a.m.));

2) control of wood biomass size and moisture level (*id.* at 109–10);

3) use of the 30% to 70% plastic vs. 70% to 30% wood blending ratio using a weigh system (*id.* at 110);

4) use of 45% to 50% plastic (*id.* at 111);

5) weigh raw materials to determine proper ratios (*id.* at 112–14);

6) storage vessels for feedstock (*id.* at 114–15);

7) screw conveying system to bring feedstock to premix area (*id.* at 115–17);

8) double arm mixers with an external heat source (*id.* at 117–18);

9) hot oil external heat system circulating hot oil through jackets to heat the raw material and melt the mixture (*id.* at 118–20);

10) operating temperature of approximately 430 , which was the approxi-

mate operating temperature of Forgione's New Jersey plant, and is within the operating temperature range described in Redmar's Licensed Technology (*id.* at 120–24);

11) use of a belt or screw conveyor to transfer mix materials to the extruder (*id.* at 125–26);

12) maintenance of heat in mixed material until fed to extruder (*id.* at 126–27);

13) use of a modified Farrel extruder to extrude and form composite (*id.* at 128–29);

14) cooling extruder barrel (*id.* at 144–45);

15) use of a heated die to form product according to requested shape (*id.* at 145–46);

16) cooling the extruded product using chain belt conveyor and ambient techniques (*id.* at 152–56);

17) sizing the material before feeding it into the extruder (*id.* at 124–25); and

18) cutting the extruded product with a knife or saw triggered by an electronic eye (*id.* at 156).

Dr. Kirby Lowery, a testifying expert in this case, also confirmed that AERT uses Redmar's Licensed Technology. Noting that there were no "substantial differences" between AERT's process and Redmar's technology, Lowery described the following identities between the two processes:

1) use of polyethylene and various wood fillers including cedar to form composite products (Tr. 3:27–28 (a.m.));

2) feedstock evaluation procedures of both plastic and wood raw material including particle sizing with sieves and moisture analysis (*id.* at 28–31);

3) use of the designated ratios of plastic (30% to 70%) to wood fiber (70% to 30%) (*id.* at 31–32);

4) use of double arm mixers to encapsulate the wood fiber (*id.* at 32–33);

5) use of operating temperatures in 200 to 550 range (*id.* at 33–34);

6) use of a hot oil transfer system (*id.* at 34–35);

7) use of belt conveyors (*id.* at 35–36);

8) storing of raw materials in waterproof systems with ample dust collector systems (*id.* at 36–37);

9) use of extrusion to make composite products (*id.* at 37–38);

10) use of a die to form composite products (*id.* at 39);

11) proper coordination and design of equipment components so as to have a proper flow through the system (*id.* at 39–40); and

12) use of particular test procedures (*id.* at 40).

Even AERT's expert, Dr. Kenneth Daugherty, conceded that AERT practices portions of Redmar's Licensed Technology at its Junction, Texas facility. At trial, he admitted that the following identities between the two processes existed:

1) use of reclaimed polyethylene plastics in formulating composites (Tr. 6:180–82);

2) use of storage vessels and weigh systems (*id.* at 182–83);

3) use of mixers and hot oil immersion systems (*id.* at 183–84);

4) use of extruders (*id.* at 184);

5) use of dies, conveyors and a cooling process (*id.* at 184–85); and

6) use of waste plastic (*id.* at 203–04).

The Brooks family was admittedly not engaged in the synthetic wood business prior to their relationship with Forgione

and his company, Redmar. After months of instruction and labor from the Forgione team, the Brookses achieved a workable synthetic wood manufacturing operation. That operation ultimately became AERT, which is now a substantially profitable public corporation. Under the settlement agreement, Forgione deserved to be paid for his contribution to the Brookses' business. His "know-how," while certainly not perfect or flawless, was not any less valuable merely because it was ultimately improved upon.

As the parties' signed 1985 confidentiality agreement stated, they both understood Redmar's "confidential information" to be this general "know-how" related to synthetic wood manufacturing. As AERT admits, and as the above testimony shows, their Junction facility does use such "know-how," and therefore, the Court finds that AERT cannot escape the provisions of the Agreement by denying that they have relied upon any of Redmar's "confidential information." [14]

### 6. Are 3H's Claims Barred By the Doctrine of Laches?

 AERT also contends that 3H's claim should be barred by the doctrine of laches. The doctrine of laches can bar a claim if (1) the plaintiff unreasonably delayed in bringing the claim, and (2) the defendant acted in good-faith and detrimentally relied on that delay. *De Benavides v. Warren*, 674 S.W.2d 353 (Tex. App.—San Antonio 1984, writ ref. n.r.e.); *Mandell v. Hamman Oil and Refining Company*, 822 S.W.2d 153, 163 (Tex. App.—Houston [1st Dist.] 1991, writ denied). If the delay is such that the defendant's ability to defend against the claim or to ascertain the true facts is impaired, then the plaintiff's claim should be barred. *Id.* at 361. However, the application of laches is usually limited to cases arising out of equity or actions at law that are essentially equitable in character. *Wayne v. A.V.A. Vending, Inc.*, 52 S.W.3d 412 (Tex.App.—Corpus Christi 2001, pet. denied) (citing *Brewer v. Nationsbank of Texas, N.A.*, 28 S.W.3d 801 (Tex.App.—Corpus Christi 2000, no writ)). Laches may not be invoked to resist the enforcement of a purely legal right. *Dillard v. Broyles*, 633 S.W.2d 636, 645 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.). A claim for breach of contract is based upon a purely legal right. *Wayne*, 52 S.W.3d 412. Furthermore, the type of extraordinary circumstances requisite to introduce laches "must work a grave injustice upon the defendant." *Id.* Finally, as an equita-

---

**14.** 3H also argues that the 1994 federal case of *Mobil Oil Corp. v. Advanced Environmental Recycling Technologies, Inc. [AERT]*, 869 F.Supp. 251 (D.Del.1994), in which AERT's patents on their manufacturing process were invalidated, should collaterally estop this Court from determining that AERT is not using the Redmar Process. Because the Court has concluded that AERT is in fact using the Redmar Process, it is unnecessary to reach the collateral estoppel argument raised by 3H regarding the *Mobil.* However, the Court would note that the argument is likely valid. The Fifth Circuit has held that in order to establish a fact pursuant to the doctrine of collateral estoppel, a party must show that (1) the issue under consideration is identical to that litigated in the prior action; (2)

the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case; and (4) there is no special circumstance that would make it unfair to apply the doctrine. *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1422 (5th Cir.1995). The jury in the *Mobil* case found that AERT's patents were invalid because they were anticipated by prior art pursuant to 35 U.S.C. § 102. The jury considered part of that "prior art" to consist of the Redmar technology. In essence, the jury's finding in *Mobil* was that the AERT process was based upon the "prior art" of Redmar's technology. Under the principles of collateral estoppel, this Court could not disagree even if it wanted to do so.

ble doctrine, invocation of laches is addressed to the sound discretion of the trial court. *Goodwyn v. Dredge Ginger Ann,* 342 F.2d 197, 197 (5th Cir.1965).

As the Court determined in its earlier summary judgment decision, because 3H's claim is based purely upon a legal right, *i.e.* breach of contract, the doctrine of laches is inapplicable. However, even if laches applied, no "grave injustice" has been worked upon AERT because of the delay. The evidence shows that six months after Marjorie Brooks formed AERT on May 20, 1988, she and the other Arkansas defendants received a demand letter from the Assignors of 3H's claim. *See* P–106. Furthermore, AERT states in its Form S–1, filed more than a year after AERT's formation, that "[t]here can be no assurance that [the Assignors] or related entities will not seek to assert a right to royalties from [AERT's] production, or other rights in the Company's technology." *See* P–14 at 14, 38. It appears that the Brooks were well aware of this claim before, during and after their formation of AERT, realizing and even anticipating the potential pursuit of this litigation by the claimants. While this dispute has indeed been proceeding for an extended period of time, with sporadic periods of inactivity, AERT can hardly argue that it has been seriously prejudiced by the renewal of the claim now.

Laches is a doctrine of equity, and because the Court does not find that 3H has engaged in any inequitable conduct, and AERT's ability to defend this claim has not been significantly prejudiced in any way, the Court will not bar 3H's suit on this ground.

### 7. Summary

For all of these reasons, the Court rejects AERT's liability defenses to the breach of contract claim, and finds that AERT is liable to 3H for failure to have paid a royalty on confidential information used by AERT to produce its products.

### B. THE BREACH OF CONTRACT CLAIM AGAINST THE BROOKS GROUP

3H also includes in its amended complaint a breach of contract claim against Juniper Industries, Southern Minerals, Joe Brooks, and Marjorie Brooks— referred to collectively as the "Brooks Group." The complaint asserts that the Brooks Group has repudiated and breached the Agreement by:

(a) Transferring, sharing, giving, and conveying to AERT and Juniper Industries technology and information, including the confidential information, that applies to the manufacturing process in Junction, Texas of using polymers and cedar fibers to produce a salable product; and

(b) Wrongfully failing to pay, or failing to cause AERT and/or Juniper Industries to pay, the $10 per ton royalties contemplated for compensation for use of Redmar and Hearthbrite processes and techniques for synthetic wood production at the facility in Junction, Texas.

*See* 3H's Second Amended Complaint at 19 (Clerk's Doc. No. 168).

The Agreement, to which each member of the Brooks Group was a named party, and which the Court has already held to be a binding contract, stated that:

There will be no restrictions on the ability of Juniper Industries, Inc., or whatever entity is operating the facility in Junction, Texas ... to pass on the manufacturing process of the confidential information ... [to] third party purchasers or assignees so long as the rights to manufacture, produce and operate through the use of that confidential information was passed on or assigned or

conveyed with the obligation that the assignee or the purchaser or the entity receiving those rights would still continue to be required to pay the royalty at the rate of one-half cent per pound.

P–32 at 5–6. In light of the foregoing language, it is clear that the Agreement provided that if the Brooks Group transferred the "intellectual property" represented by the Redmar technology to any third party—something all parties clearly anticipated in the Agreement—then the Brooks Group was obligated to also make certain that the third party accepted the obligation to pay the $10 per ton royalty for use of that technology. In fact, in an obvious effort to be as explicit as possible about this contractual requirement, the Agreement concludes with the following reiteration:

> Finally with respect to the payment of the royalty for using the confidential information, it is the intent of the parties to this settlement that Juniper Industries, Inc., Juniper Products, Inc., or the Brooks family or whatever entity ends up operating that facility and, also, whatever assignee or purchaser of that facility, that none of these parties at any time now or in the future be allowed to operate using this process except under the condition of paying the royalty that's been described in our agreement.

*Id.* at 8.

The evidence clearly demonstrated that the Brooks Group transferred the confidential information to AERT, and that AERT used the technology at the Junction facility to manufacture its products. Thus, the Brooks Group would be in compliance

with the Agreement only if AERT accepted the obligation under the Agreement to pay the $10 per ton royalty. Prior to trial, there was serious doubt as to whether AERT had in fact accepted this obligation. *See, e.g.* Defendant AERT's Motion for Summary Judgment (Clerk's Doc. No. 80 at 2) (denying that it is a party to or assignee of the Agreement and contending the it therefore has no obligation to pay a royalty). This doubt was resolved, however, by AERT's concession on the first day of trial that it would be responsible for any royalties the Court might find are due under the Agreement for the products AERT has made. Because AERT has accepted the responsibility for any royalties the Court finds are due under the Agreement for goods produced by AERT, the Court finds that the Brooks Group has fulfilled its obligation under the Agreement to only "allow[ ] [AERT] to operate using th[e Redmar] process . . . under the condition of paying the royalty that's been described in [the] agreement." [15] The Court therefore finds for the Brooks Group as to Count Two.

### c. DECLARATORY RELIEF

In the "conclusion" sections of both its Closing Argument (Clerk's Doc. No. 194) and Closing Rebuttal (Clerk's Doc. No. 197), 3H requests that the Court enter a declaratory judgment requiring the Defendants to pay 3H a royalty on a monthly basis on AERT products made in the future. The Court declines to enter any such judgment, because 3H's pleadings do not contain a request for declaratory relief. The Second Amended Com-

---

15. Because the Court in this case is only awarding damages for past breaches, AERT's concession is sufficient to absolve the Brooks Group of liability under Count Two. However, because AERT made this concession "for purposes of this proceeding only, and for no other purpose whatsoever," Tr. 1:19–20

(a.m.), should AERT fail to pay royalties, if any, that might be due in the future, the Brooks Group could be responsible for such royalties if AERT once again contests its responsibility to pay such royalties because it is not a party to, nor assignee of, the Agreement.

plaint (Clerk's Doc. No. 168) contains two clearly delineated counts, the first alleging a breach of contract against AERT, and the second a breach of contract by the Brooks Group. Neither contains a request for a declaration, and there is no mention in the Second Amended Complaint of either the Texas or federal declaratory judgment acts. The prayer for relief mentions a request for specific performance, but that is a very different and distinct remedy from a declaratory judgment. Because the pleadings do not support an award of declaratory relief, the Court declines to enter a judgment for same.

▮ Even if the pleadings supported the request for declaratory relief, its is far from clear whether the Court would award it. It became apparent during this litigation that AERT has made refinements and alterations to the original Redmar process, changes that have brought AERT's manufacturing operation farther and farther away from its initial dependence upon Forgione's technology. Clearly, at some point AERT's refinements and the independent development of its process will lead to a time when the AERT process can no longer be said to be "using the [Redmar] confidential information." Because of the gradual nature of this divergence, however, it will likely be impossible to identify precisely when the "point of sufficient independence" has occurred. The Court believes that the inability to identify this point of divergence with scientific precision does not mean that AERT is obligated to pay a royalty indefinitely. At some point, and probably at some point soon, AERT will have refined its process and made enough independent developments, that it will not be able to be said that AERT is using the "confidential information" to produce its products. Regardless, the Court need not enter declaratory relief at this time, given that there are no pleadings to support it. The decision on declaratory relief, if any is necessary in the future, will have to be based on evidence of the specific manner in which AERT is manufacturing at that time.

D. DAMAGES

The only evidence with regard to the calculation of damages in this case was presented through the expert testimony of Dr. James R. Vinson, who was offered by 3H. AERT did not dispute Dr. Vinson's calculations, nor did AERT offer any calculations of its own. As such, the Court will rely upon Dr. Vinson's testimony in its determination of the damages due 3H for breach of contract. In short, Dr. Vinson determined damages by calculating the tons of product produced by AERT over the period covered by his calculations, and then simply multiplied that weight by the one-half cent per pound (or ten dollars per ton) royalty, and thereby obtained past-due royalty amounts. There was no contest to the manner in which Dr. Vinson calculated the total weight of product produced, and the Court finds that Dr. Vinson's approach on this point was reasonable, and reliable.

The Court finds that the damages in this case are limited by the applicable statute of limitation for breach of contract in Texas. Texas Civil Practice and Remedies Code § 16.051 mandates that damages for breach of contract shall not be available for activity that occurs more than four years prior to the date of suit. As such, because this suit was brought in May of 2000, 3H cannot receive damages for any breach of the Agreement that occurred before May of 1996. Demonstrating its understanding of this statute's applicability in this case, 3H had Dr. Vinson calculate the total royalty due from May 1996 through the time of trial (December 2001). That amount was $820,998. Tr. 4:58–59 (p.m.).

▮ Although AERT did not offer any direct criticism of Dr. Vinson's damage

analysis, it contends that the damage analysis failed to establish properly the amount of past royalty due because 3H did not distinguish between products made with cedar fiber and products made with other hardwoods. AERT argues that the Agreement only requires that it pay a royalty on products produced by using *cedar* fiber. *See* P–32 at 3. AERT claims that because their manufacturing process at certain times used non-cedar hardwood fiber for some of its products, 3H was obligated to prove how much of AERT's production used cedar fiber (as opposed to other hardwoods), and that 3H's failure to do so is fatal to its recovery of damages.

AERT's argument relies on the language of the Agreement describing *who* is to pay the royalty, instead of that which describes *how* the royalty is to be computed. Specifically, the language imposing the royalty obligation states that a royalty is due "on all products produced using the confidential information." *Id.* Plainly, that language does not limit the royalty to products produced with cedar, but instead limits it to products made using the "confidential information." As discussed above, the "confidential information" was described in a document entitled "Redmar's Licensed Technology." *See* P–52. That document clearly included within Redmar's "confidential information" hardwood fiber as a possible component in the manufacturing process. *Id.* at 1–2.[16] It makes sense that Redmar's Licensed Technology would cover hardwood fiber in that Forgione's New Jersey plant primarily used hardwood—something that Joe Brooks specifically noted when he visited the plant in 1985. Tr. 2:108 (a.m.); 6:248. In fact,

Joe Brooks conceded at trial that "hardwood" as a raw material was covered in the Redmar's Licensed Technology document. Tr. 4:92–93 (a.m.).

As noted, the language that AERT relies on for its argument describes the entity obligated to pay the royalty, as opposed to how the royalty was to be computed. The language AERT relies on states:

> Juniper Industries, Inc. or whatever entity or whoever operates a manufacturing and production plant in Junction, Texas, which produces product by using polymers *and cedar fiber*, will pay a royalty . . . on all products produced using the confidential information.

P–32 at 3 (emphasis added). Clearly, the reference to the use of cedar fibers here was intended to describe broadly the class of potential successors to Juniper which Forgione intended to be bound to pay the royalty, and in no way expresses an intent to limit the royalty to products produced using cedar, as opposed to some other hardwood.[17] Accordingly, from the plain and unambiguous language of the Agreement, the Court finds that the Agreement states no distinction for royalty purposes between products produced with cedar fiber and products produced with hardwood fiber. As such, 3H's failure to make this distinction in its damages calculation is of no consequence. Accordingly, with regard to past due, unpaid royalties on products produced using the "confidential information," the Court finds that AERT is liable to 3H in the amount of $820,998.

## IV. CONCLUSION

For these reasons, the Court finds for Plaintiff 3H on its Count One breach of

---

**16.** "The Licensed Technology teaches using waste oak, cedar, hickory, ash, pine, maple, etc. wood fibers . . . ." P–52 at 1.

**17.** This is not the only place in the Agreement in which Forgione attempted to make it clear that the obligation to pay the royalty extended to successors of any kind of Juniper Industries, Inc. There are numerous references throughout the Agreement to this point, which were discussed in detail in Court's October 22, 2001 Order on summary judgment, (Clerk's Doc. No. 141), at 8–10.

contract claim against AERT, and finds against 3H and for the Brooks Group on the Count Two breach of contract claim against the Brooks Group. Further, the Court finds that 3H is entitled to damages from AERT in the amount of $820,998 for royalties due through December 2001, in addition to prejudgment and post-judgment interest on this sum.

Because the parties' briefs were silent on this issue of prejudgment and post-judgment interest, the parties are directed to submit briefing to the Court regarding the appropriate amount of prejudgment interest, the correct rate for post-judgment interest, and the form of the judgment which they believe should be entered in light of the Court's rulings. Prior to submitting such briefs, the parties should confer in an attempt to agree regarding these issues. Should the parties be unable to agree, no later than June 5, 2002, the Plaintiff should submit a brief addressing interest (and any other issues related to the form of judgment appropriate in light of this opinion), along with a proposed judgment. The Defendants' response, and its proposed judgment, should be filed no later than June 19, 2002. Any reply by Plaintiff is due by June 26, 2002. Should the parties reach agreement on these issues, an agreed submission and proposed form of judgment should be filed by June 5, 2002. Upon receipt of this briefing, the Court will enter a judgment consistent with this opinion. With regard to attorney's fees, the Plaintiff shall follow the procedures and deadlines called for by FED. R. CIV. P. 54 and Local Rule CV–7(i).[18]

---

18. Plaintiff also has a Motion for Sanctions (Clerk's Doc. No. 79) pending, on which the Court will reserve ruling until after the issue of attorneys' fees has been resolved.